## Wм. Peterkin and others' Lessee, *vs.* Wм. Inloes and others.

The grant of letters of administration is *prima facie* evidence that the person, upon whose estate they were granted, was dead at the date of the letters.

The plaintiffs claimed title under the patent of a tract of land, which was authorised to be added to the city of Baltimore by the act of 1773, ch. 4, and the privileges conferred by that act. Held:

That this act conferred no privileges to the owners of this tract, unless the addition was made in pursuance thereof; and a prayer setting out the

grounds on which the plaintiffs were entitled to recover, and which failed to leave to the jury to find that the addition was made under this act, is for this reason defective.

A prayer asserting the escheat of a tract of land, without submitting to the jury to find that the patentee died *intestate* as well as without heirs, is for this reason defectively framed.

The patentee of a tract of land covered by navigable water died in 1709, devising the same by will to his wife, who died the same year. No claim was made by any one, under the patentee or his wife, before 1745. HELD:

That this evidence was not sufficient to warrant the finding, that the tract escheated before 1745; the law does not presume that a person dies without heirs, and the absence of claim is not to be taken against the defendants, the land being covered by navigable water.

The further lapse of twenty-eight years from 1745, or sixty-four years from the death of the wife of the patentee, will not authorise the finding, that the tract was escheat as of that time.

An escheat patent is evidence of escheat at the date of the warrant, and not before.

An escheat warrant authorised the party to take up the whole tract called "*Bold Venture*," as escheat, but the escheat patent, dated in 1759, granted to the patentee a certain number of acres of said tract, "*clear of elder surveys.*" HELD:

That from this patent it may fairly be inferred, that the State had, previous to the act of 1773, under which the plaintiff claimed, granted the whole tract; the recital, "*clear of elder surveys,*" means elder surveys of "*Bold Venture,*" and is evidence of a previous grant of the residue of the tract.

APPEAL from Baltimore county court.

This was an action of ejectment, instituted by the lessors of the appellant to recover one acre of land, described in the declaration as part of "*Mountenay's Neck*," which is referred to in the preceding case of *Hammond's Lessee vs. Inloes, et al.*, and in the cases in 11 *G. & J.*, 351; 6 *Gill*, 321; and 1 *Gill*, 430. The plea and defence were the same as in those cases.

*Exception.* The plaintiffs claimed under the title of "*Mountenay's Neck*," and the title papers offered by them, exhibiting the chain of title from Alexander Mountenay, in 1663, to Thomas Sligh, in 1759, and from Sligh to William Hammond, as heir at law of Thomas Hammond, for fourteen and one-quarter acres, part of "*Mountenay's Neck*," are the same set

forth in 1 *Gill*, 435 to 442.   They then offered two successive leases of part of this fourteen and one-fourth acres, the first, dated 6th of December 1776, from William Hammond to Isaac Hall; the second, dated 24th of July 1782, from John Hall to Benjamin Spencer, under whom the plaintiffs claim by descent.   They further offered deeds conveying eleven acres, part of "*Mounlenay's Neck*," in fee, from Thomas Sligh, in 1760, to Charles Weisenthal; from Weisenthal, in 1775, to John Cornthwait; and from Cornthwait, in 1782, to said Benjamin Spencer.   They then proved the death of said Spencer before 1820, and that two of the lessors of the plaintiff, William and Joshua Peterkin, are the grand-children of said Spencer, and the two others, William and Ellen Peterkin, his great-grandchildren, those who stood before them in the line of descent, being proved to be dead.   They then offered a license by the mayor of Baltimore to said Spencer, to extend a wharf therein described, and the same acts and ordinances as in the preceding case of *Hammond vs. Inloes*, and also the act of 1784, ch. 39, and 1816, ch. 209, and proved that the land opposite the lot claimed by them had, from time to time, been extended, filled up and made fast land out of the water, as delineated in the plats, and the possession of it by the defendants.   They also offered the plat of the addition to Baltimore town under the act of 1773, ch. 4.   The defendants then offered the patent of "*Bold Venture*," and the same evidence appearing in 1 *Gill*, 451 to 468.   The plaintiffs then offered the patent of "*Rogers' Inspection*," granted in 1759 to affect in part "*Bold Venture*," which is described therein as "*escheat land*," (see 1 *Gill*, 471 to 474,) and also a certified copy of a certificate for a tract of land called "*Pemblico*," surveyed for John Oulton and others, on the 26th of April 1669, and an assignment thereof, on the 5th of August 1714, by John Hays, as administrator of John Oulton, to Thomas MacNemara, and the patent for said tract subsequently, on the 10th of December 1714, issued to said MacNemara.   They then also offered certificates from the register of wills for Anne Arundel county,

showing that letters of administration were granted on the estate of John Oulton, on the 23rd of September 1709, and on the estate of Mary Oulton, widow, on the 7th of October 1709. The defendants then offered the will of John Oulton, executed on the 4th of May 1709, and admitted to probate on the 11th of July 1709, by which he devised to his wife, Mary Oulton, "*Bold Venture*," and all his other lands in fee. The plaintiffs then offered the following prayers:

1st. If the jury find the patents, deeds and permission or license of the mayor and city council of Baltimore, offered in evidence on the part of the plaintiffs, and that the same are properly located; and if, from the evidence and from said deeds, and the recitals therein, and from the acts of possession of Benjamin Spencer, and those claiming under him, that possession had gone along with said deeds, &c., then they are bound to presume a deed from Mountenay to Blunt, and from Isaac Hall to John Hall, or if they find the deeds from Sligh to Weisenthal, from Weisenthal to Cornthwait, and from Cornthwait to Benjamin Spencer, the elder, and that said Spencer died intestate before the year 1820, leaving Elizabeth, his only child and heir at law, and that said Elizabeth, previous to the death of her father, intermarried, in the year 1802, with William Peterkin, and that said Elizabeth and William died intestate about the year 1825, leaving five children, two girls, both of whom died intestate and without ever having been married, and three boys, George, William and Joshua, the two last named being plaintiffs; that George intermarried with Maria Anne Atkinson, by whom he had two children, his heirs at law, living at his death, to wit, William and Ellen Peterkin, two of the plaintiffs; that said George died between the years 1830 and 1835; that if they find the acts of Assembly and ordinances given in evidence, and further find, that in pursuance thereof, the grounds in front of the plaintiffs' lot, as located, was filled up and extended for the width thereof from time to time, as far as to the dock at Lancaster street, and made fast land, and was in possession of defendants before the institution of this suit,

then, by force of the operation of said acts and ordinances, and facts aforesaid, if the jury find them, the plaintiffs are entitled to recover.

2nd. If they find the facts of the aforegoing prayer, and also the papers given in evidence relating to "*Pemblico*," and those relating to the administrations granted on the estates of John Oulton and Mary Oulton, respectively, and that said Mary Oulton is the Mary Oulton named in the writing offered in evidence as the will of John Oulton; and that said John and Mary died in the year 1709, and shall not find any claim made by any one under said John or said Mary for "*Bold Venture*," at any time between their deaths, respectively, and the year 1745, then they may find, that before that year there had ceased to be any heirs of John Oulton to take said tract by descent, and any persons to take the same through said Mary, as devisee under said will by descent, and that said tract so became, before the year 1745, vested in the State, and if they find as aforesaid, then the plaintiffs are entitled to recover, if the jury also find the addition made to Baltimore town, under the act of 1773, ch. 4, as testified, and as shown by the plat of said addition given in evidence, and by the locations in the cause.

3rd. If they find from the facts of the aforegoing prayers, and shall not find any claim to have been made by any one under said John or Mary for "*Bold Venture*," after their said deaths, and before the year 1700 and 1743, then they may find, that before the latter year there had ceased to be any heirs of said John to take said tract by descent, and any persons to take the same through said Mary, as devisee under said will by descent, and that before the year 1773, the said tract so became vested in the State; and that if they shall find as aforesaid, the plaintiffs are entitled to recover, if they also find the addition made to Baltimore town, under the act of 1773, ch. 4, as testified, and as shown by the plot of said addition given in evidence, and by the locations in the cause.

The defendants offered the same three prayers as in the preceding case. The court, (LE GRAND, A. J.,) rejected the

plaintiffs' and granted the defendants' prayers, to which grant‑
ing and refusal the plaintiffs excepted, and the verdict and
judgment being against them they appealed.

The cause was argued before Eccleston, Mason and
Tuck, J.

*Grafton L. Dulany* for the appellants, argued and insisted
upon the same points as argued by the counsel for the appel‑
lants in the preceding case; and further contended, that in
this case there was evidence tending to show that both John
and Mary Oulton died intestate and without heirs before the
act of 1745, ch. 9, and that, consequently, before or at the
time of the passage of said law, the title to "*Bold Venture*"
was vested in the State, and passed, by that act and the law
of 1773, to all improvers under them. That the facts of the
death of Oulton and his wife, without heirs, ought to have
been submitted to the jury. The second and third prayers of
the plaintiffs should have been granted, and the second and
third prayers of the defendants ought to have been refused.
2 *Howard's Rep.*, 319, 385. 12 *Peters*, 454. 3 *H. & J.*,
554. 7 *G. & J.*, 369. 7 *H. & J.*, 136. 6 *G. & J.*, 481.
11 *G. & J.*, 360. 1 *Gill*, 509.

*William F. Giles* for the appellees.

1st. As to the rights of the parties, independent of "*Bold
Venture:*" The proprietors of "*Fell's Prospect*" have equal
rights with the owners of "*Mountenay's Neck.*" "*Fell's
Prospect*" was granted 1763, and the act of 1773 is the only
act under which the plaintiffs claim. In 11 *G. & J.*, 359,
no act of 1773 was referred to, but that decision went
upon the act of 1745. The act of 1773, in fact, added two
hundred acres to the city, and included "*Fell's Prospect.*"
A legislative act is a grant, and the defendants are therefore
grantees of *equal* date with the plaintiffs, for "*Fell's Prospect*"
was added to the city the *same day* with "*Mountenay's Neck.*"
This makes the distinction between this case and the case in

11 *G. & J.*, because in that there was no reference to the act of 1773, and the plat made under it. The legislature could distribute favors to whom it chose. There was no inherent power in the elder patent, that it should alone be the recipient of these favors. The right to improve is a *quasi property*, but it vests only when the improvements are made, and this applies to us, the owners of "*Fell's Prospect*," as well as the owners of "*Mountenay's Neck*." The legislature have the right to grant land covered by water. "*Mountenay's Neck*" originally ran across an arm of the *sea*, and therefore was not riparian any more than "*Bold Venture*." The grant of "*Bold Venture*" has been again and again affirmed by this court. The only limitation upon the sovereign power is, that it cannot grant land so as to interfere with the rights of navigation and fishery. The case in 2 *H. & McH.*, 246, turned upon the point that there had been a fraud committed upon the lord proprietary in obtaining the grant of the patent of "*Bold Marsh*." The directions of the lord proprietary to the land office was, that all lands within five miles of Baltimore should be reserved and not granted, and the application for the resurvey of "*Bold Marsh*" did not aver that it was within five miles of the city, which was *in fact* the case, and the patent was vacated on this ground. The doctrine of alluvion never sanctioned the idea that if there was a sudden subsiding of the sea, the land would belong to the riparian proprietor; in such a case it would belong to the State, and so if an island suddenly springs up. The riparian proprietor gets what increases little by little, of which the law takes no notice— *gradual* accretion.

2nd. As to the effect of "*Bold Venture:*" If an heir of Mrs. Oulton should appear, what would bar his recovery? nothing! The outstanding title is good. The evidence shows that the property became fast land in 1836, and could not have been taken possession of before. Limitations could not run against an heir of Oulton, except from the time when the land became fast, and if such an heir should come forward to-day he could recover. There has been no claim or possession

adverse to that of *John Oulton.*   But the case has been twice decided, and unless this case differs in a material point from the case in 6 *Gill,* the judgment must be affirmed.   It is said that it is different, because the acts of 1796 and 1816 are now in.   But the act of 1796, ch. 68, gives new rights to nobody, it simply erects Baltimore town into a city.   The 11th sec. gives the city council full power to control all improvements into the basin, but it makes no new grants to anybody.   The act of 1816 is merely an act to enlarge the city of Baltimore. These acts therefore make no difference in the two cases. The only additional evidence is the administration on the estates of John and Mary Oulton, and the grant of "*Pemblico,*" and this is introduced to show an escheat of "*Bold Venture*" prior to 1745.   But this evidence falls, because the defendants show the will of *Oulton,* by which he devises the land to his wife and makes her his heir.   But *Mrs. Oulton* also died the same year, and administration was granted on her estate.   This is no evidence that she died intestate, because the custom then was to grant letters of administration as well where there was a will as where not.   There has been no search for her will; she may have left a large family and the record still be correct.   The answer to this is, that no claim has been made by the heirs of Oulton.   No claim could be made until 1836, when the land first appeared above water.

The propositions of law embraced in the plaintiff's prayers could, by no possibility, be granted.   The first prayer is defective for various reasons.   There is but one *Spencer* mentioned in the evidence.   There is no proof that the daughters of Peterkin died intestate and without issue.   They may have had issue without being married, and in such case the issue, though illegitimate, would have been the *heir at law.*   There is no evidence as to when these children died.   This prayer does not raise the question which survived, *Peterkin or his wife.*   There is no evidence that Benjamin Spencer died intestate.   Again it could not be granted, because it takes no notice of "*Bold Venture.*"   It supposes that the plaintiffs

could recover in spite of *"Bold Venture,"* which is directly in the teeth of the decision in 6 *Gill.*

The second prayer could not be granted, because it calls upon the jury to say that if there was no *descent* the plaintiffs could recover, whereas there might have been a devise of the land in question. An escheat cannot be proved by proving that there are no parties claiming by *descent.*

*Reverdy Johnson* on the same side.

1st. As to the true interpretation of the acts of 1745 and 1773: What are the rights a proprietor gets where his land borders on a navigable river? The first right such riparian owner has is a right of *navigation and of fishery.* As to fishery, he has the *exclusive* right to draw his net to his own shore. He has no exclusive right to navigate, though he has to start his vessels from his own *land.* But there is another right belonging to such properties, and that is the right of *alluvion.* Now what is this right? It is the right to become the owner of all the land which may accrue by *gradual* accretion; but such increase must be *gradual.* The reason of this right is, because he is liable to lose by the washing away of his lands. It must be *gradually acquired,* it cannot be *made:* if the sea subsides *at once,* the land uncovered does not belong to the proprietors of the original tract, because in such case there is not found the essential ingredient of *gradual* accretion—so if an island suddenly springs up. If this be so, there is then no impropriety in granting fast land to one and land covered by water to another. But this is not now an open question. The State may grant land covered by water outside of the fast land. The opinion in 1 *Gill,* 512, by Judge *Dorsey,* is sustained by the case of *Brown vs. Kennedy,* 5 *H. & J.,* 202, 204, 208, 209. The same doctrine is advanced in 11 *G. & J.,* 358, by Justice *Stephens.* The law of this State then is, that the grant of *"Mountenay's Neck"* does not include the land covered by *"Bold Venture,"* and gave no title to land south of its *southernmost* line. Independent then of the act of 1745, if the owners of *"Mountenay's Neck"* had

undertaken to fill up the land included within the lines of "*Bold Venture*," by driving down piles, or anything else, the owner of "*Bold Venture*" could have brought ejectment and stopped them. Apart from the escheat of "*Bold Venture*," then, the case is clear of difficulty.

Up to 1745, then, the patentee of "*Bold Venture*" was the owner of all the land within its lines. If the State had the right to grant this patent, it is inconsistent that the owners of "*Mountenay's Neck*" should be entitled to any part of it. But it is admitted for the sake of the argument, that this rule is qualified so far as to prohibit the grant of land in "*Bold Venture*," so as to interfere with the alluvial rights of "*Mountenay's Neck*." This would only give the first grantee the same right as against the second grantee that he would have as against the State. But what is this right of alluvion?—it is not the right to improve. The act of 1745 gave the riparian owners the right to have what they would not have by the right of alluvion. All the owners of these water lots under this act had equally the right to *improve*, including the owners of "*Bold Venture*." The land here has not been made by any alluvion, but by artificial causes. The same facts exist here as in *Brown vs. Kennedy.* The act of 1745 has nothing to do with the alluvial rights belonging to "*Mountenay's Neck*"—it is entirely separate and distinct. The State had the right to grant the land, and having granted "*Bold Venture*" in 1695, she could not, in 1745, by any power of grant, authorise the owner of "*Mountenay's Neck*" to come within the lines of "*Bold Venture*."

Again, the doctrine of 11 *G. & J.* is not applicable to this case. In that case the defendants claimed title by virtue of "*Fell's Prospect*," and claimed as riparian owners also. But at the time the act of 1745 was passed, "*Fell's Prospect*" *was not granted*, and this was the weakness of the defendants' case. The court did not, in that case, decide, that in reference to the dates of the patents themselves, the right to improve belonged to the eldest title, they only decide, that as "*Fell's Prospect*" was not then granted, the right to improve

Peterkin's Lessee *vs.* Inloes, *et al.*

belonged to "*Mountenay's Neck.*" 11 *G. & J.*, 359. The act of 1745 was a *quasi* grant, and attached to each of the water lots which the State had previously granted by patent. If the act of 1773 had not passed, the owner of "*Mountenay's Neck*" could lay no claim to this property; they only had it by that act. They do not get this right by *seniority* of patent by virtue of that act, because it then, for the first time, brings "*Mountenay's Neck*" into Baltimore city, but at the *same time* "*Fell's Prospect*" was brought in. Suppose these two tracts were granted by the same patent, with the power to make this improvement, would one part of it have any right over that of another? But the fact that they were granted at different times makes no difference. The right here was a right in the nature of a franchise attaching to the lands, *first* given by the act of 1773. At that time we were then holders of water lots as well as were the holders of "*Mountenay's Neck.*" The right *vested eo instanti* in the proprietors of the two tracts.

*Dulany* for the appellants, in reply.

The merits of the case are not affected by the little discrepancies and omissions in the prayers, and these points ought to be discouraged, and this is in strict conformity to the act of 1825, ch. 117. 11 *G. & J.*, 361. The objection comes too late, and moreover, there is sufficient in the record to submit the question of possession, independent of the deeds.

It is said, that as the act of 1773 was passed after both patents of "*Fell's Prospect*" and "*Mountenay's Neck,*" it threw the right of improvement upon both *equally*. This puts the parties in conflict as to their rights, and the *rule* then is to give it to the *eldest patent*. This was the rule laid down in 11 *G. & J.*, in analogy to the seniority of patents when granted of the same land. 1 *Gill*, 510. 1 *Gill*, 506, 507. The effect of an *escheat* is to draw with it all the rights which belonged to the original patent.

The points involved in this case have been decided in the case of 2 *H. & McH.*, 246. The fact that the lands in that

24    v.4

case were within in the *reserves* does not vary the case, for the act of 1782, ch. 38, appropriates these reserves to such purposes as the General Assembly should thereafter direct.   This reserve was therefore dedicated by the act of 1773 to the improvements specified by that act.   2 *Md. Ch. Decisions*, 495.

The ground of the decision in 1 *Gill* and 6 *Gill* is upon the effect of the outstanding title of "*Bold Venture.*"   The construction of the act of 1745 and 1773 was unquestionably erroneous.   The doctrine of estoppel does not apply to a legislative act.   The words of the act of 1745 are in the *future tense*, as well as in the past.

TUCK, J., delivered the opinion of this court.

As the present controversy grows out of the same title as that set up in the case of *Hammond vs. Inloes, (ante,* 138,) and the suit was defended in the same manner, reference is made to the opinion in that case for a statement of what we consider to have been settled by the former decisions of this court, and by which some of the questions argued on this appeal are also to be determined.

It is sufficiently shown by the letters of administration on the estate of John and Mary Oulton, that they were dead in the year 1709.   1 *Greenlf. on Ev.*, sec. 550.   He devised "*Bold Venture*" to Mary Oulton in fee.   As evidence that this tract escheated after her death, the plaintiffs relied on the patent of "*Rogers' Inspection,*" granted in 1759, which was also in evidence in the case of *Wilson vs. Inloes,* 6 *Gill,* and on the first trial of *Casey vs. Inloes,* 1 *Gill.*

The plaintiffs offered three prayers and the defendants offered three, identical with those presented in 6 *Gill,* and the case of *Hammond vs. Inloes,* at this term.   If the plaintiffs' case has not been materially improved, the judgment of this court must be the same in both cases.

Objection has been made on the part of the appellees to the title of the plaintiffs, independently of any defence on their part founded upon the grant of "*Bold Venture.*"   They have also contended, that as the title of the plaintiffs' com-

menced in 1773 by the legislative grant of that year, (as now insisted by them,) no priority of franchise or right to improve could be claimed by one riparian owner over another, both being such at the passage of that act; and that as the addition to Baltimore town, then made, first included the water line of "*Mountenay*" and that of "*Fell's Prospect*," under which the defendants claim, both of which had been previously granted, the owners of these tracts must be considered as entitled, cotemporaneously, to the "immunities and privileges" conferred by that act; that is, the right to impr____ _____ in the act of 1745: and that "*Mountenay*" ___ no bett__ situation in that respect than "*Fell's Prosp__t.*" We deem it unnecessary to express any opinion up__ _____ ____, because we think that the interests of the p_rties require that the case should be disposed of by a decision of the others.

The *first* prayer of the plaintiffs was defective, in not submitting to the jury to find, whether the addition to Baltimore was made as located on the plats.   If the act of 1745, at the time of its passage, did not affect the property in controversy, because it had not then become a part of Baltimore, the act of 1773 conferred no privileges to the riparian owners, unless it appeared that the addition was made in pursuance of that act. According to the prayer, the jury might have found for the plaintiffs, even if the addition had never been made.

But this prayer is defective in not taking notice of the title of "*Bold Venture*," for the reasons assigned by us in *Hammond vs. Inloes*, to which reference is made.

The *second* prayer asserts that "*Bold Venture*" escheated before 1745.   The evidence shows that Mary Oulton died in 1709.   But it does not submit to the jury whether she died intestate as well as without heirs.   But apart from this defect in the frame of the prayer, we think that the evidence was not sufficient to warrant the finding of an escheat before 1745. The law does not presume that a person dies without heirs. The absence of any claim of title by those representing her is not to be taken against the defendants, when we consider the nature of the property, as we have heretofore said, in *Ham-*

*mond's case.* If "*Rogers' Inspection*" be relied on as proof of escheat, we must not forget that the Court of Appeals, in 1 *Gill*, 510, decided that a patent is evidence of escheat at the date of the warrant and not before. The other evidence, in our opinion, does not show that the property had returned to the State at an earlier period than April 1759, the date of the warrant for "*Rogers' Inspection.*"

The *third* prayer, predicated on the same proof, refers the escheat of "*Bold Venture*" to 1773, and asserts that it was sufficient to authorise the jury to find that fact as of that time. We do not think that the further lapse of twenty-eight years from the time of Mary Oulton's death will, under the circumstances of this case, produce that result. And if "*Rogers' Inspection*" is supposed to be evidence of the fact, as of the date of the warrant, it must be taken altogether, as well against, as for, the party offering it in evidence. And from it it may fairly be inferred, that the State had, previously to the act of 1773, granted all of "*Bold Venture;*" for that patent grants to Rogers a certain number of acres, "*clear of elder surveys,*" which must mean elder surveys of "*Bold Venture,*" because Rogers was entitled by his warrant to take up the whole of that tract as escheat. This statement in the patent we regard as evidence, upon the authority of this court in 1 *Gill*, 492, where an ancient certificate of the surveyor was received as evidence, that at that time the premises were in possession of the persons named therein as being in possession.

We are of opinion that this case is not materially different from *Hammond vs. Inloes;* and for the reasons assigned and upon the authorities cited in both cases, we approve of the refusal by the court below to grant the plaintiffs' prayers, and of their instructions to the jury as prayed on the part of the defendants.

*Judgment affirmed with costs.*