HARRIET G. C. SPRIGG, HENRY N. LOCK, and
others, Lessors, *vs.* RANDLE H. MOALE and
JOSEPH MOUNTGARRETY, Tenants in Possession.

*Ejectment—Evidence—Presumption of death—Presumption of Dying without issue—Traditionary Evidence—Province of Court and Jury—Weight of Evidence, and Legal Sufficiency of Evidence.*

It is incumbent on the lessors of the plaintiff in Ejectment, claiming by collateral descent, to show who was last legally seized of the land in controversy, and then to prove his death without issue, and next to prove all the different links in the chain of descent, which will show that the person so last seized. and the claimants, descended from some common ancestor; together with the extinction of all those lines of descent which could claim in preference to the lessors of the plaintiff. They must prove the marriages. births and deaths and the identity of persons necessary to fix title in themselves. to the exclusion of others, who would have, if in existence, a better title to the land sought to be recovered.

The facts, first in order to be established, in the deduction of title, are that the *propositus* died before the bringing of the action; and that he died without issue, as his lineal descendants, if any, would exclude all collateral kindred.

The death of a person may be presumed to have happened before the bringing of the suit, where it would be contrary to the ordinary course of nature that he should be living at that time, though there is no legal presumption of the period *when* death occurred, or *up to which* life endured.

If it be alleged that a person died, or was dead, at any particular time within the period after which he will be presumed to be dead, the fact must be established by evidence.

But while this is the rule as to the fact of death, it does not follow that the party is presumed to have died without issue.

Where the party is shown to have been married, and his wife living at the time of the last intelligence of him, the law makes no presumption against issue; and the plaintiff must show that he had no issue, or that issue is extinct.

In cases where the whole evidence is traditionary, when it consists entirely of family reputation, or of statements of declarations made by persons who died long ago, it must be taken with such allowances, and also with such suspicions as ought reasonably to be attached to it. When family reputation, or declarations of kindred made in a family, are the subject of evidence, and the reputation is of long standing, or the declarations are of old date, the memory as to the source of the reputation, or as to the persons who made the declarations, can rarely be characterized by perfect accuracy.

Although the weight of evidence is for the jury, yet when the question is raised as to whether there be any evidence legally sufficient to be submitted to them, to enable them to find the facts sought to be established, it becomes the duty of the Court to look to the whole evidence adduced, and to determine, as well from its quality, as its general tenor, whether after deducing all reasonable inferences therefrom, it be legally sufficient to constitute the foundation of a verdict;—whether a verdict founded upon it could in justice and judicial propriety be allowed to stand? If not it is clearly the duty of the Court to instruct the jury, that there is no evidence *legally sufficient* to be considered by them.

APPEAL from the Superior Court of Baltimore City.

The lessee of the appellants brought an action of Ejectment in the Superior Court of Baltimore city, to recover part of a tract of land, called "Upton Court Resurveyed," lying on the middle branch of the Patapsco river, within the city of Baltimore. The declaration was in the common form. In the progress of the cause, Randle H. Moale, was made defendant, and appeared; and confessing lease, entry and ouster, he pleaded "Not guilty." Upon the trial, a verdict was rendered in favor of the defendant.

Nine prayers were offered by the plaintiff at the trial. Eight of these, touching questions of possession, were granted by the Court, (MARTIN, J.) The plaintiff's ninth prayer, and two prayers of the defendant, related to the title of the lessors of the plaintiff. The Court refused the plaintiff's ninth prayer, and granted the said two prayers of the defendant. And the Court further instructed the jury "that there was no evidence in the cause from which they could find that the lessors of the plaintiff, or any of them, were

entitled to the land demanded in this suit as the heirs at law of Jacob Giles, nor of the said John Giles, nor of the said Nathaniel Giles, nor of any issue or devisee of the said Jacob, John or Nathaniel, or any other person in whom the jury can or ought to find that the inheritance of said land claimed in this action vested, at or after the death of the said Jacob Giles."

From this ruling of the Court the present appeal was taken.

The facts of the case are fully stated in the opinion of this Court.

The cause was argued before BARTOL, C. J., STEWART, BRENT, MILLER and ALVEY, J.

*George H. Williams* and *Arthur W. Machen*, for the appellants:

In order to exclude the lessors of the plaintiff, the defendant must establish one of two hypotheses. The first hypothesis is, that Jacob Giles died leaving issue, and that his issue is not extinct. The other is, that he died without issue, but before 1788, and was survived by John or Nathaniel, or by issue of John or Nathaniel, and that the issue of John and Nathaniel have not since become extinct.

But, in the absence of evidence to the contrary, it is competent to presume, after the lapse of more than one hundred years, that Jacob Giles is dead, and that he died without issue. *Doe, demise of Oldham, vs. Wolley,* 8 *Barn. & Cr.,* 22, (15 *E. C. L.,* 150;) *Doe, demise of Oldnall, vs. Deakin,* 3 *Carr. & Payne,* 402, (14 *E. C. L.,* 369;) and also 2 *Mann. & Ry.,* 195, (17 *E. C. L.,* 300;) *King vs. Fowler,* 11 *Pick.,* 302; *Rowe vs. Hasland,* 1 *Wm. Bl.,* 404; *Thomas vs. Visitors of Frederick County School,* 7 *Gill & John.,* 383–7. A greater strictness is used in Peerage cases, yet even in these a *prima facie* case like that of the present plaintiffs would be sustained. See *Hubback on Succ.,* 227, (47 *Law Lib.*) There is no presumption

that a party married, and if marriage be proved, there is no presumption that he left issue. It is a fact to be proved, and the burden of proof lies on the party who avers it. *Matthews on Presumption*, 292, 293, top; *Loring vs. Steincman, et al.*, 1 *Met.*, 211. Intestacy is presumed, *Hubback on Succ.*, 64, (47 *Law Lib.* 62.) In short, the general presumption is, that things remain as they are. When a particular life is in question, this presumption of the continuance of it in the same state, gives rise, after the lapse of a considerable time, to a counter presumption derived from the universal law of mortality. Unexplained *absence* from *home or country*, without tidings, affords ground for a presumption of death after the lapse of seven years. These three presumptions, and the grounds and relations of them, are well stated in *Hubback on Succession*, 167–72; see also 1 *Greenl. Ev.*, sec. 41, *and notes*.

The proposition that a person died without *heirs* is evidently very different from that of his death without issue, and much wider. Here presumption stops. For, as the land descends to collateral kindred, indefinitely, the presumption of law rather is that he had heirs, and against an escheat. *Wilbur vs. Tobey*, 16 *Pick.*, 180; *Hammond's Lessee vs. Inloes, et al.*, 4 *Md. Rep.*, 174. *Richards vs. Richards*, 15 *East.*, 294, *n.*, sometimes cited without distinction upon these questions, was a case where the person in question had died *within living memory*. And it is on this ground that Mr. Hubback, reconciles it with the later and better authority of *Doe, demise of Oldnall, vs. Deakin.* For, as he observes, it may be that where the death of the supposed ancestor is of ancient date, and negative evidence consequently difficult of attainment, it will be presumed that he died without issue, so as to shift to the other side the burden of proof, which would there be easier being of an affirmative and probably more modern fact; and that, where, as in *Richards vs. Richards*, the death has occured within living memory, some evidence of the failure of issue will be required at the plaintiff's hands. *Hubback on Succession*, 225, 226, 47 *Law Lib.* 170.

Applying the legal presumptions to the circumstances of the present case, it results:

First. That Jacob Giles must be presumed to be dead. In the absence of facts to base the seven-years presumption upon, there is no room to presume that he died before 1788. On the contrary, the doctrine of the presumed continuance of life would reach beyond that point. *Duke of Cumberland vs. Graves*, 9 *Barb.*, 595, 608.

Secondly. As no issue of his are shown to have ever existed, it must be inferred that he died without issue.

Thirdly. The two children of John Giles, the younger, named in his will, viz: Sarah Giles and Elizabeth Giles, as they were living in 1736, the date of the will, must now be dead. No issue being proved, it must be presumed that they died without issue.

Fourthly. The four children of Nathaniel Giles—supposing the conjecture of the defendant, concerning the identity of Nathaniel, with the testator of 1730, to have any real foundation—and all the daughters of the elder John Giles, other than Anna Maria, are effectually disposed of in the same manner. Indeed, the non-appearance of any person to claim under any of these persons, after so great an interval of time, is ground for a conclusive presumption that none such exist. *Earl of Roscommon's Claim*, 6 *Cl. & Fin.*, 98, *and* 129, 130, *per Lord Redesdale;* 2 *Greenl. Evidence,* sec. 355.

But the case of the plaintiff by no means rests on presumption merely. They have furnished positive proof of the non-existence of any better claimants, the best proof the nature of the case admits of. When it is proved that no such persons are known in the family, every thing is done which the law requires. The purport of the testimony of *Mrs. Stewart*, must have been overlooked by the learned Judge, when he took the case away from the jury. Far weaker evidence of tradition and reputation in the family has often been received, even where the facts were compara-

tively recent. *Hubback on Succession*, 204, 205, case of *Lord Galmoy*, (47 *Law Lib.;*) *Ibid* 650, (48 *Law Lib.;*) 2 *Greenl. Evidence*, sec. 278, *g; Secrist vs. Green*, 3 *Wallace, S. C.*, 744, 750.

*William Schley*, for the appellees:

As the estate of Jacob Giles was acquired by purchase, he is the *propositus* from whom title must be deduced. *Hammond's Lessee vs. Inloes, et al.*, 4 *Md. Rep.*, 174; *Peterkin's Lessee vs. Inloes, et al.*, 4 *Md. Rep.*, 187; *Earl of Roscommon's Claim*, 6 *Cl. & Finnelly*, 129; *Doe, demise of Lloyd, vs. Deakin*, 6 *Eng. C. L. Rep.*, 477; *Rowe vs. Hasland*, 1 *W. Bl.* 404; *Loring vs. Steineman, et al.*, 1 *Metcalf*, 211.

Hence it is necessary to establish, as a fact, that Jacob Giles died without *issue;* for his lineal descendants, if any, would inherit, in exclusion of collateral kindred. *Hubback on Succession*, 199, (47 *Law Lib.*,) *and the whole of chap.* 3. And inasmuch as it appears that he was a married man, the natural presumption is, that he had issue. It was the absence of the fact of marriage, which controlled the decision in the case of *Doe, Lessee of Banning, vs. Griffin*, 15 *East*, 294. In the case of *Richards vs. Richards*, (in the note there,) there was no proof that the party was *not* married. In this last case, the Court said: " The plaintiff must remove every possibility of title in another person before he can recover; no presumption being admitted against the person in possession." 2 *Bl. Comm.*, 221; 47 *Law Lib.*, 152; 1 *Saunders' Pl. & Ev.*, 1005; 74 *Law. Lib.*, 345; *Act of* 1786, *chap.* 45; *Act of* 1820, *chap.* 191; *Stewart's Lessee vs. Jones*, 8 *G. & J.*, 1; *Hammond's Lessee vs. Inloes, et al.*, 4 *Md. Rep.*, 172.

Whilst it is conceded, that in the civil law there is a positive presumption of *intestacy*, there is no such presumption in the common law. It is said by Sir EDWARD SUGDEN, ( *Vendors and Purchasers*, 1 *vol.* 330,) that the purchaser may require proof of the ancestor's intestacy. In regard to personalty, proof of intestacy is a necessary preliminary to granting

letters of administration. The true rule would seem to be, that proof of some relevant facts or fact is necessary to create a presumption either way.

If the two last mentioned propositions do not bar the plaintiff from recovery, then the *time* of the death of Jacob Giles becomes material. From the facts proved—the long continued absence of the party, the great age he would have attained if he had remained in life, the absence on the part of his niece, Mrs. Linthicum, of any knowledge concerning him —the natural as well as the legal presumption is, that he died before the 20th January, 1787, the day of the passage of the Act of 1786, chap. 45, entitled "An Act to direct descents." *Doe, demise of George, vs. Jesson*, 6 *East*, 85; *Doe, demise of Knight, vs. Napear*, 27 *E. C. L. R.*, 42, and in 2 *Mees. & W.*, 891; *Loring vs. Steineman, et al.*, 1 *Met.*, 204; *Wilkes vs. Lyons*, 2 *Cow.*, 333.

Prior to said Act, the doctrine of primogeniture prevailed in Maryland. *Hall vs. Jacobs*, 4 *Harr. & Johns.*, 245; *Stevenson vs. Howard*, 3 *H. & J.*, 554; *Thomas vs. Visitors of Frederick County School*, 7 *G. & J.*, 385; *Miller vs. Beates*, 3 *Serg. & Rawle*, 493.

The plaintiff in his declaration claims an entirety. As the law formerly stood, a plaintiff who claimed an *entirety*, could not recover an *undivided* interest. *Doe, demise of Barney, vs. Adams*, 2 *Crompton & Jervis*, 232; *Doe, demise of Poole, vs. Errington*, 28 *Eng. C. L. R.*, 199; *Carroll vs. Norwood*, 5 *Harr. & Johns.*, 173; *Lessee of Binney vs. The Chesapeake and Ohio Canal Company*, 8 *Peters*, 214.

And it is insisted, that this rule of pleading was not changed by the Act of 1833, chap. 276, embodied in the Code of Public General Laws, secs. 50 and 51, in respect of a case where there is no "joint holding," as in case of coparceners, or purchasers, or devisees claiming under the same title.

ALVEY, J., delivered the opinion of this Court.

This is an action of ejectment, in which the lessors of the plaintiff claim title to the land in dispute, as heirs-at-law, in different degrees, of Jacob Giles, by collateral descent. It appears that John Giles, the father, who died in the year 1725, had, some time before his death, compounded for a tract of land called Upton Court, lying on the Patapsco river, in Baltimore county, but died before he obtained a patent therefor; and by his will, dated and admitted to probate in 1725, he devised a part of Upton Court to his son John Giles, and the residue thereof to his son Jacob Giles. This will of the elder John Giles discloses the fact that he had, at the date of the will, eight children; three sons and five daughters; namely, John, Jacob, Nathaniel, Betty Lewis, Sophia Murray, Anna, Mary and Sarah. The three sons were made executors of the will of the father. It also appears that on the 12th of August, 1731, a patent for Upton Court issued to John Giles, the son and devisee, who, by deed of the 28th of February, 1732, granted, released and confirmed to his brother, Jacob Giles, all that part of Upton Court which had been devised to the latter by the will of the father; and on the 1st of March, 1732, Jacob Giles conveyed to John Moale, the ancestor of the appellee, a parcel of Upton Court, supposed to contain two hundred acres, more or less; but that such conveyance to Moale did not embrace the entire portion of Upton Court conveyed to Jacob Giles, by the deed of his brother, of the 28th of February, 1732. And it is for the recovery of the residue of such parcel of Upton Court, conveyed by the deed of the 28th of February, 1732, and not embraced in the deed to Moale, that this action is brought. It is alleged that Jacob Giles never parted with such residue of the parcel of Upton Court, conveyed to him by his brother, and that he died *without issue* and intestate; and that all the blood of John Giles, the elder, has become extinct, except the descendants of Anna or Anna Maria, one of the daughters of John Giles, Sr., and a sister of Jacob, who married Oliver

Cromwell, and had issue; and that the lessors of the plaintiff are her descendants, and through her claim as heirs-at-law of Jacob Giles.

At the trial below there were several prayers offered by the respective parties; and eight of those on the part of the plaintiff were granted, as were two of those on the part of the defendant. The ninth prayer, however, of the plaintiff, was refused; and that, and the two prayers of the defendant that were granted, presented the question of the title of the lessors of the plaintiff, and their right to recover in this action. The Court, after ruling upon the prayers offered, further instructed the jury that the plaintiff could not recover; and upon the ruling in reference to the ninth prayer of the plaintiff, and the decisive instruction of the Court, against the right of the plaintiff to recover, the primary question is presented, whether there was evidence in the cause, *legally sufficient*, to be considered by the jury, tending to establish title in the lessors of the plaintiff. It was incumbent upon the lessors of the plaintiff, claiming as they do, by collateral descent, to show who was last legally seized of the land in controversy, and then to prove his death, without issue; and next to prove all the different links in the chain of descent, which will show that the person so last seized, and the claimants, descended from some common ancestor; together with the extinction of all those lines of descent which could claim in preference to the lessors of the plaintiff. They must prove the marriages, births and deaths, and the identity of persons, necessary to fix title in themselves, to the exclusion of others who would have, if in existence, a better title to the land sought to be recovered. The facts first in order, to be established by the lessors of the plaintiff, in the deduction of title, were, that Jacob Giles, the *propositus*, died before the bringing of this action; and that he died without issue; as his lineal descendants, if any, would exclude all collateral kindred. It is contended, however, on the part of the plaintiff, that both of these facts are made evident by presumption, under the facts

and circumstances of this case. As to the fact of the death of Jacob Giles, we think it clear that it may be presumed to have happened before the bringing of this suit, because it would be contrary to the ordinary course of nature that he should be living at that time; though there is no legal presumption of the period *when* death occurred, or *up to which* life endured. *Hubback on Succession*, 185. If it be alleged that a person died or was dead, at any particular time within the period after which he will be presumed to be dead, the fact must be established by evidence. But while this is the rule of presumption as to the fact of death, it does not follow that the party is presumed to have died without issue. Where, as in this case, the party is shown to have been married, and his wife living at the time of the last intelligence of her, the law makes no presumption against issue; and the plaintiff must show either that he had no issue, or that issue is extinct. That there is no legal presumption that the party died without issue, we think has been expressly decided in the case of *Richards vs. Richards*, 15 *East*, 293, *note*, and which has been cited and approved by the Court of Appeals of this State, in the case of *Hammond's Lessee vs. Inloes*, 4 *Md. Rep.*, 175. The case referred to in *East* was an action of ejectment, and the lessor of the plaintiff claimed as heir by descent, and showed the death of his elder brothers, but not that they died without issue. The Court said: "This must likewise be proved. The plaintiff must remove every *possibility* of title in another person, before he can recover; no presumption being admitted against the person in possession." And in *Hubback on Succession*, 199, it is laid down as an established principle in the rules of evidence applicable to cases of succession, that "in order to show the death of *all* nearer heirs, it is necessary to negative the coming into existence of those who would be such. That without the establishment of the non-existence of issue as a distinct species of fact from that of death, the proof of heirship would be defective, will thus appear: if A., be a nearer heir than the claimant, and it be

proved that he died, having had two children, B. and C., and the deaths of these children be also proved, the claimant is not entitled to succeed if issue of either B. or C., or if other issue of A. be extant. Evidence may be adduced of the deaths of all the known members of senior branches through successive generations, and still the task will follow of satisfying those who are to decide, that no issue exists of the lowest or latest descendants, added to that of establishing, of each individual member, that he had no other children than those who have been accounted for." Therefore the fact of dying without issue is not made out by legal presumption. Nor do we think it is made out by presumption of fact.

The testimony given in reference to Jacob Giles, and the Giles family, was of the most vague and indefinite character, and such as from which no satisfactory conclusion could have been drawn. The witnesses upon whose deposition reliance is placed to establish the extinction of all the blood of John Giles, Sr., except that through Anna Maria Cromwell, were Henry Linthicum, Elizabeth Linthicum and Mrs. Matilda H. Stewart. The first named witness says he had no acquaintance with the Giles family. He married into the Cromwell family, and he traces with sufficient accuracy the pedigree of that family, and shows it to be very extensive. He says he had "understood from his wife, that the children of John Giles, Sr., were John Giles, Jr., and Jacob Giles, and, he *thinks*, Nathaniel Giles and Anna Maria Giles. Witness *thinks* John Giles, Jr., left two daughters, but does not remember their names, but *thinks* one of them was named Sarah and the other Elizabeth, and does not know whether they were married, but *thinks* he understood that they did not marry, but is not sure about it. Witness never heard of any issue from Jacob, and he *thinks* he understood he died without issue." This witness' knowledge, gathered from his wife, or whatever other source, seems to be exceedingly defective, so far as it concerns the Giles family. He seems never to have

heard of Betty Lewis, Sophia Murray, Mary and Sarah Giles, daughters of John Giles, Sr., and who were certainly alive at the date of their father's will, in 1725. Nor does he seem to have heard any thing of the four children of Nathaniel Giles, named in his will of 1730. It is manifest, therefore, that the traditionary knowledge of this witness in regard to the several branches of the Giles family, except the one to which he was connected by marriage, was very imperfect and unreliable. The testimony of Mrs. Elizabeth Linthicum is even less definite than that of Henry Linthicum. She says she had " always understood from her family, that John Giles was the father of said Anna Maria Giles, and that John Giles had a son named Jacob Giles, and two other sons whose names were Nathaniel Giles and John Giles. Witness never heard any talk of the son John Giles, until lately, and does not know that he had any children." And the testimony of Mrs. Stewart, most relied on by the plaintiff, is characterized more for the absence of knowledge upon the subject, than for any definite proof that it furnishes in regard to the Giles family. She says that Anna Maria Cromwell was the daughter of John Giles, the elder, "who had also children named Jacob, Nathaniel and John Giles." She says nothing of the other daughters of John Giles, Sr. She further says, "I have never heard of any descendants of Jacob Giles, Nathaniel Giles, or John Giles; if they had any descendants, they are long since dead. I know of no descendants of old John Giles, living, except the descendants of Anna Maria Giles, by her husband, Oliver Cromwell." "I never saw Nathaniel, Jacob, or John Giles. They died long ago. I don't know where Nathaniel and Jacob died." Now it will be observed, that though this lady says she had never heard of any descendants of Nathaniel and John Giles, it is certain that they both left children, if their wills can be relied on as proof of the fact. Because she had never heard of any descendants of either Jacob, John or Nathaniel Giles, it is hardly fair to conclude that they never had any, or that they were all dead; especi-

ally as we have the most reliable evidence that two of them had descendants. And this is all the evidence in the cause from which the jury could have found that the only surviving blood of John Giles, Sr., was in the descendants of Anna Maria Cromwell, and to constitute the ground of the plaintiff's right to recover in this action. To this evidence the observations of Lord LANGDALE, M. R., made in the case of *Johnson vs. Todd*, 5 *Beav.*, 599, are strikingly applicable, and no stronger case could be furnished to exemplify their truth and wisdom, than the present." "In cases," said he, "where the whole evidence is traditionary, when it consists entirely of family reputation, or of statements of declarations made by persons who died long ago, it must be taken with such allowances, and also with such suspicions, as ought reasonably to be attached to it. When family reputation, or declarations of kindred made in a family, are the subject of evidence, and the reputation is of long standing, or the declarations are of old date, the memory as to the source of the reputation, or as to the persons who made the declarations, can rarely be characterized by perfect accuracy."

And although the weight of evidence is for the jury, yet, when the question is raised, as it is here, as to whether there be any evidence legally sufficient to be submitted to them, to enable them to find the facts sought to be established, it becomes the duty of the Court to look to the whole evidence adduced, and determine as well from its quality as its general tenor, whether, after deducing all reasonable inferences therefrom, it be legally sufficient to constitute the foundation of a verdict;—whether a verdict founded upon it, could in justice and judicial propriety be allowed to stand? If not, it is clearly the duty of the Court to instruct the jury that there is no evidence *legally sufficient* to be considered by them. That was done in this case and we think rightfully done. If the testimony of the witnesses referred to, contains any probative force at all, in regard to Jacob Giles, it is to establish the fact of his death before the year 1787, the time when the

Act of 1786, to regulate descents, went into operation. Henry Linthicum, was eighty-one years of age, when he was examined in 1857, and Mrs. Elizabeth Linthicum, examined in 1855, was then in her eighty-sixth year, and was therefore about eighteen years of age in January, 1787. And although connected with the family, and of such great age, neither of these witnesses has any other knowledge that such a person as Jacob Giles ever existed, than through vague tradition. It would not seem to be probable that if her uncle had been living in 1787, Mrs. Linthicum would not have known it, and have knowledge of his subsequent death. Yet, she only speaks of having understood in her family, that John Giles, Sr., had a son named Jacob; and she had never heard any talk of John Giles, Jr., until lately. And if it be true that Jacob Giles died before January, 1787, though he may have died intestate and without issue, the descent would have been according to the rule of the common law, and all the female lines excluded, until the entire extinction of those of the male.

As we discover no error in the rulings of the Court below, its judgment will be affirmed.

*Judgment affirmed.*

(Decided 20th April, 1868.)