The judgment is reversed, and the prosecution ordered dismissed.

PER CURIAM.

The foregoing opinion of the Commission of Appeals has been examined by the judges of the Court of Criminal Appeals and approved by the court.

On State's Motion for Rehearing.

MORROW, P. J.

In his motion for rehearing, state's counsel takes issue with the interpretation of the precedents cited in the original opinion, upon which the decision rests. Attached to the motion is a letter written in 1921 by one who was at that time Assistant Attorney General to an individual expressing an opinion contrary to the reasoning upon which the reversal of the judgment was based. The letter apparently has no official standing, contains no citation of authority, and embraces no argument. There is also attached to the motion a copy of an opinion issued by the Attorney General's department of this state some ten years ago which bears evidence of thought and research. The opinion, however, deals with a subject different from that covered by this appeal, and if we comprehend it, makes no announcement in conflict with the conclusion reached in the original opinion in this case. Before the conclusion of this court was reached and announced, the question of law upon which the case turns was given careful investigation, and the decision rendered reflected the judgment of this court after full deliberation. After our re-examination of the subject in the light of the motion for rehearing, we are constrained to regard the former announcement as the proper disposition of the appeal.

The motion is overruled.

**KELLOGG et al. v. SOUTHWESTERN LUMBER CO. OF NEW JERSEY.**

No. 2065.

Court of Civil Appeals of Texas. Beaumont.
Nov. 12, 1931.

Rehearing Denied Dec. 31, 1931.

E. E. Easterling, Thos. J. Baten, and W. D. Gordon, all of Beaumont, and Bogard & Anderson, of San Augustine, for appellants.

Terry, Cavin & Mills, of Galveston, Andrews, Streetman, Logue & Mobley, of Houston, C. S. Ramsey, of San Augustine, John Forse, of Newton, and W. T. Davis, of San Augustine, for appellee.

WALKER, J.

This was a suit in trespass to try title involving the Kellogg grant of 1,107 acres in San Augustine county. Judgment was in favor of appellee on an instructed verdict, from which appeal has been prosecuted to this court. This is the second appeal. On the first trial appellants were plaintiffs and J. R. Chapman was defendant. That trial was to a jury with judgment in favor of Chapman, from which appeal was prosecuted to this court, where, in an opinion by Judge Brooke (Kellogg v. Chapman, 201 S. W. 1096, 1097), the judgment of the lower court was reversed and judgment rendered for appellants. Writ of error was granted against that judgment, and by opinion of the Commission of Appeals, expressly approved by the Supreme Court (Chapman v. Kellogg, 252 S. W. 151), the judgment of this court was reversed and the cause remanded to the trial court for a new trial. The parties to this appeal are identical with the parties to the first appeal, except the Chapman title is now owned by appellee, Southwestern Lumber Company of New Jersey. As a preliminary statement of the material facts necessary for a consideration of the issues involved, we quote as follows from Judge Brooke's opinion on the former appeal, with the explanation that for the appellee Chapman should be substituted appellee, Southwestern Lumber Company of New Jersey:

"It appears from the record that Kellogg, the original grantee, was a single man, and was killed by the Indians in the year 1839; that Kellogg was an immigrant to Texas, and at his death his estate was administered on in Texas by his brother, Ebenezer Kellogg. Ebenezer died in 1840, and K. L. Anderson became his administrator. It further appears that A. G. Kellogg had been a merchant in San Augustine from the year 1835 down to his death, and dealt extensively in lands as well as merchandise. After the death of A. G. Kellogg, one A. Horton, custom collector of the republic of Texas, obtained a judgment

against K. L. Anderson, administrator of the estate of A. G. Kellogg, Matthew Cartwright, and L. E. Griffith, rendered at the March term of the court in 1840. On the 2d day of November, 1841, there was issued an original execution on the judgment, and the writ on this shows that A. G. Kellogg's headright was pointed out as his property, and levied upon to satisfy the judgment. A deed was made by William Kimbrough, sheriff, to M. Cartwright, dated July, 1842. Matthew Cartwright conveyed 100 acres of this headright on the 19th of December, 1858, to Josiah Parker. Matthew Cartwright died about the year 1870. On the 30th of May, 1871, a partition of his lands among his children was had, and the land in controversy was set aside to his son, Leonidas Cartwright. Leonidas Cartwright conveyed 100 acres of land to H. L. Lucas in 1899, 100 acres to D. C. Odom in 1899, and on the 2d day of October, 1905, he conveyed the remainder of the tract to H. P. Weir for a consideration of $2,000, and H. P. Weir, on October 16, 1905, executed a deed thereto to Marrs McLean to secure a note due by Weir to W. D. Gordon for $2,000, due 12 months after date. On the 18th of October, 1906, Weir executed a deed to Gordon transferring the said land, reciting that it was in full settlement of the indebtedness of said Weir recited in the deed of trust. On the 5th day of January, 1907, Gordon and Weir executed a deed to Wm. L. Pearson conveying the said land, except the 300-acre tract as above set out. This record also reflects the fact that, from 1846 down to Leonidas Cartwright's sale of the land to Weir in 1905, the land was assessed for taxes to M. Cartwright in his lifetime, and after his death to his son, Leonidas Cartwright, and parties claiming under them. It is further shown by the record that Kellogg and Coote were partners in the mercantile business in 1835; that from 1836 to 1838 Kellogg was running the business alone, and Coote does not appear to have had any interest in the same. It is also shown that in 1835 Coote had a wife and two boys, as shown by the application he made for a grant in Texas on January 24, 1835.

"On the part of defendant, Chapman, there was offered in evidence the county clerk of San Augustine county, and he testified that there is in his custody an original deed among papers commonly designated as the archives, dated January 3, 1836, purporting to be executed by A. G. Kellogg before John G. Love, and witnessed by David Brown and Samuel Stivers. This original instrument was then read in evidence, and purported to be a conveyance of the Kellogg headright by Kellogg to Wm. Coote for a consideration of $200. There was also offered in evidence a certified copy of the same instrument."

The deed from Kellogg to Coote is set forth in hæc verba by the Commission of Appeals in its opinion as reported above, at page 152 of 252 S. W. In connection with this deed appellee also offered a deed from Coote to Terry H. Cahal which, with the acknowledgment under which it was recorded, is also given by the Commission of Appeals in its opinion at page 153. These two deeds were recorded in the deed records of San Augustine county on the 17th day of March, 1845. Appellee also offered a complete chain of title from the heirs of Terry H. Cahal conveying it the Cahal title. It also offered in evidence a judgment for the land in controversy rendered in federal court at Beaumont in 1907 in favor of one of its remote grantors against H. P. Weir. Appellants, who are the collateral heirs of Albert G. Kellogg, also offered in evidence a judgment of the district court of Hardin county dated the 21st day of July, 1914, wherein they recovered the land in controversy against the holders of the Cartwright title, and also against the unknown heirs of William Coote, Terry H. Cahal, and Emily Gentry Cahal Johnson, a daughter of Terry H. Cahal.

The first question to be considered is the validity of the execution sale to M. Cartwright. While appellee insists that this sale was absolutely void, yet it says, if it was valid, it now owns the title under the federal court judgment against Weir. On the other hand, appellants insist that the sale to M. Cartwright was valid, and that they own it under their Hardin county judgment of date the 21st of July, 1914. It is our conclusion that this sale was absolutely void, and vested Cartwright with no title. On this issue the record shows that Horton recovered his judgment at the March term of court, 1840, against Kellogg's administrator and his two sureties; that this land was pointed out as belonging to the Kellogg estate; and, having been thus pointed out, was regularly seized and sold under execution issued on the Horton judgment and bought by M. Cartwright at a time when no adverse claim was on record in the deed records of San Augustine county. Under the Probate Act of February 5, 1840 (Hartley's Dig., arts. 995–1052), judgments for money against decedents or their administrators could not be enforced by execution from the district court, but only by the probate court, after being duly certified thereto for enforcement. Construing this act, in Boone v. Roberts, 1 Tex. 147, the Supreme Court said: "It is true that, on the judgment, execution does not issue against the property of the succession, and the judgment is ranked only among the acknowledged debts of the estate."

Again, in Bason v. Hughart, 2 Tex. 476, where a claim had been presented to the administratrix and refused, the court said:

"The appellant seeks to reverse the judgment—

"1st. On the ground that the court erred in awarding an execution against the administratrix. * * *

"It will be seen by referring to the 19th and 20th Secs. of the Act to regulate proceedings in the Probate Court in successions, passed in 1840 (Acts, p. 116), that the court clearly erred in awarding execution on the judgment. It is expressly prohibited suing out execution, but the judgment is to be settled concurrently with other debts against the estate; this however, can be corrected in this court."

See, also, Conkrite v. Hart, 10 Tex. 140; Ansley v. Baker, 14 Tex. 607, 612, 65 Am. Dec. 136; Robertson v. Paul, 16 Tex. 472; Fortson v. Caldwell, 17 Tex. 627; Boggess v. Lilly, 18 Tex. 200; Cunningham v. Taylor, 20 Tex. 126; Emmons v. Williams, 28 Tex. 778; Meyers v. Evans, 68 Tex. 466, 5 S. W. 66; Hooper v. Caruthers, 78 Tex. 432, 15 S. W. 98; Bradford v. Knowles, 86 Tex. 505, 25 S. W. 1117; Taylor v. Williams, 101 Tex. 388, 108 S. W. 815. Appellants would support their construction of this judgment by Stark v. Carroll, 66 Tex. 393, 1 S. W. 188, and Solomon v. Skinner, 82 Tex. 345, 18 S. W. 698. These cases are not in point on the facts of this case. Thus, Stark v. Carroll was a partition suit. There had previously been litigation in the federal court, and an execution for costs had been issued as to some of the parties and sale had thereunder. Some of the parties to the execution were then dead, but those holding under such parties did not question the sale. The others tried to question the sale. The court held that, as to the parties then alive, their title was lost, and that the purchaser became a tenant in common with those whose titles were not divested. Solomon v. Skinner does not support appellants' contention that, under the law at the time Horton recovered his judgment against the administrator, it constituted a lien against the land belonging to the estate, and therefore the district court had power to order the land sold in satisfaction of the judgment lien. In that case no administration was sued out and no showing was made that one was necessary. The suit was merely for the foreclosure of a lien against the heirs and not for a money judgment. In the case at bar the suit was for a money judgment against the administrator, and, if a lien was created, it existed merely by virtue of the judgment.

We think Graham v. Vining, 1 Tex. 639, which was under the Probate Act of 1840, is conclusive against appellants' proposition that the district court had power to enforce its judgment by execution, on the ground that it constituted a lien against the land in controversy. In that case the debt was secured by a mortgage. It was not presented to the administrator, as required by the seventeenth section of the Act of 1840. On this ground the trial court sustained an exception to the

petition, and judgment was entered for the defendant. Affirming this judgment, the court said: "The object of the above sections manifestly was, to prevent litigation and unnecessary expense to estates, and promote their settlement with as little delay as practicable. If suits were permitted to be brought, without first ascertaining, by a presentation of the claim, whether it would be contested or not, much of the assets would be absorbed in costs. The language of the 17th section, before cited, is sufficiently comprehensive to embrace every claim for money, of whatever grade, upon which suit was necessary to its assertion in a court of law. A debt secured by a mortgage on specific property, forms no exception. If presented, allowed, and placed on the tableau of acknowledged debts, it can have all the benefit of its specific lien, without the necessity of suit. Should the funds of the estate be sufficient, it will be paid out of the general funds; if not sufficient without sale, the sale will be ordered by the court on the application of the executor or administrator, or, on their failure to make such application of the creditor; and in making the order of sale, the Judge will have regard to the nature of the claims. See 29th Sec. of same Act."

Appellants further insist that the sale in question was not subject to collateral attack. This contention is denied. Being absolutely void, it was subject to attack at any time and in any court, by any interested party where its validity was an issue. As the sale to Cartwright was absolutely void, it is not necessary that we decide the issue of its ownership, that is, whether appellee acquired it under the federal court judgment against Weir or whether appellants acquired it under their Hardin county judgment of date July 21, 1914.

On the former appeal the appellate courts discussed fully the validity of the deed from Kellogg to Coote, and held that the Kellogg title passed to Coote under that deed. Further, the Commission of Appeals held that the Hardin county judgment vested these appellants (the collateral heirs of Kellogg) with whatever title was owned at that time to the land in controversy by the unknown heirs of Coote. On this appeal we recognize these holdings as the law of this case. In fact, appellants made no further attack on the deed from Kellogg to Coote, but centered their fight on the deed from Coote to Cahal. Against that deed they filed an affidavit of forgery, thereby casting upon appellee the burden of proving its execution, as at common law. The trial court, by instructing a verdict, held that appellee, as a matter of law, had discharged this burden. Appellants contend that the evidence, as a matter of law, failed to raise the issue of due execution of this deed; but, if wrong in that contention, that the issue should have

gone to the jury. Discussing this deed on the former appeal, the Commission of Appeals held that it "was not properly authenticated for record." However, citing article 3700, of Vernon's Sales' Revised Civil Statutes of Texas, as amended in 1907, the Commission of Appeals said, if it were necessary to construe this act, "We would be inclined to hold that this copy of the deed from Coote to Cahal was admissible." On the issue raised by the affidavit of forgery, the Commission of Appeals further said that "the copy of the deed to Cahal and its ancient record were admissible as circumstances to show the execution of the original."

The additional circumstances reflected by the former appeal, sustaining the genuineness of the Cahal deed, may be summarized as follows: (a) It was recorded in connection with a copy of the Kellogg-Coote deed and had been of record since 1845; (b) the original Kellogg-Coote deed was in the archives of San Augustine county; (c) the land was assessed for taxes for the years 1849, 1850, and 1851 in the name of T. H. Cahal by his agent, John C. Brooke. On this evidence, on the former · trial the jury found that the Coote-Cahal deed was "a genuine instrument of conveyance." Notwithstanding this court's holding against that finding as being entirely without support in the evidence, the Commission of Appeals said, in reversing the judgment of this court, "We think the jury's finding in favor of the genuineness of this deed found sufficient basis in the record." These circumstances, together with other testimony, which will be hereinafter set out, were offered on this second trial. In view of this holding of the Commission of Appeals, we overrule appellants' contention .that no evidence was offered in support of the genuineness of the Coote-Cahal deed, and therefore overrule their proposition that, as a matter of law, they were entitled to an instruction that it was a forgery.

At this point we overrule appellants' contention that appellee failed to sustain the issue of heirship; that is to say, we ·hold that, if the Coote-Cahal deed was genuine, the heirs under whom appellee holds were the children of the grantee in that deed. The facts sustaining this conclusion will be set out later in the opinion. We state this conclusion at this point in order to determine the merits of appellants' proposition that, under its Hardin county judgment, it showed title, at least, to an. undivided one-third interest in the land in controversy. Cahal had five children. Two of them died without issue. The other three were daughters, and appellee holds under two of them, Miss Dee Cahal and her ·sister, Mrs. Mary Cahal Osborn. The third daughter was Mrs. Emily Gentry Cahal Johnson, whose unknown heirs were. parties' to the Hardin county judgment of .date the.21st of July, 1914,.in.which appellants recovered judgment against them for the land in controversy. The death of Mrs. Johnson was shown, but there was no evidence on the issue as to whether or not she was survived by any children; that is, there was no evidence to show affirmatively that appellee's grantees inherited the estate of their sister, Mrs. Johnson. On this showing appellants were entitled to an instructed verdict for an undivided one-third interest in this land. Under the law of this state, there was no presumption that Mrs. Johnson's collateral relatives, under whom appellee holds, inherited her estate. The affirmative burden was upon appellee to show that fact, and this burden was in no way discharged. This proposition is fully sustained in Gorham v. Settegast, 44 Tex. Civ. App. 254, 98 S. W. 665, 666, where the court said:

"Before reciting the substance of the evidence upon which appellants seek to establish title to the property in controversy as the heirs of Eli Noland, we will state what, under the law, it was necessary for them to prove in order to entitle them to recover. It will be observed that they are claiming by collateral descent. One claiming by such descent must show who was last entitled, and then prove his death without issue. Next prove all the different links in the chain of descent which will show that the one who was last entitled and the claimant descended from the same common ancestor, together with the extinction of all those lines of descent which could claim any preference to the claimant. He must prove the marriages, births, and deaths and the identity of the persons necessary to fix title in himself, and the extinction of others who have, if in existence, a better title. This is done by proving the marriages, births, and deaths necessary to complete his title, and showing the identity of the several parties. He must prove that all the intermediate heirs between' himself and the ancestor from whom he claims are dead, without issue. 3 Wash. on Real Property (3d Ed.) § 38; Abbott's Trial Ev. § 24; 3 Elliott on Ev. §§ 2188, 2189; Anson v. Stein, 6 Iowa, 150; Skinner v. Fulton, 39 Ill. 484; Sprigg v. Moale, 28 Md. 497, 92 Am. Dec. 698; Shriver v. State, 65 Md. 278. 4 A. 679."

There is no merit in appellee's counter propositions against this conclusion. For instance, they say that appellants were not entitled to this instruction, because, being plaintiffs, the burden rested upon them to prove affirmatively their title. They did this by proving the heirship of Mrs. Johnson and by introducing their Hardin county judgment against her and her unknown heirs. Again they say that appellants were not entitled to this instruction because they did not sue for an undivided interest, and failed to prove the extent of the interest actually owned ·by. them. In order to recover Mrs.

Johnson's interest, appellants were not required to sue for an undivided interest; but only to show the extent of her interest. They established this issue by showing that she was one of the three heirs of T. H. Cahal. Again, they say that the deed from Banks, as attorney in fact for the Cahal heirs, was not a quitclaim deed, but a conveyance of title, and therefore by this deed the burden was cast affirmatively upon appellants to show that Mrs. Johnson left children surviving her. There is no merit in this proposition. Holding under heirs, whatever was the character of their deed, appellee was put upon inquiry as to the extent of their interest, and was required to prove affirmatively the extent of the interest conveyed by their deed. If we were affirming the judgment of the lower court as to the remaining two-thirds interest in the land, it would be our duty to reverse the judgment as to this one-third interest and here render judgment therefor in favor of appellants. But, as the entire judgment must be reversed for reasons hereinafter stated, and as it appears that this issue was not fully developed, it is our duty to reverse the judgment also as to this one-third interest for further trial. This was the order made in Enterprise Co. v. Neely (Tex. Civ. App.) 217 S. W. 1088, where the court sustained appellant's proposition that it was entitled to an instructed verdict.

 We come now to appellants' proposition that the court erred by peremptorily instructing the jury that the Coote-Cahal deed was genuine. The following statement summarizes all the circumstances offered on this issue, as we understand the record:

(a) From the date of the execution of the Coote-Cahal deed to the execution of the power of attorney by the two Cahal heirs to Mr. Banks, there was no affirmative claim under the Cahal title to the land in controversy, except the rendition of the land for taxes, as above stated.

(b) Judge Caruthers of Tennessee, a distinguished jurist, was the uncle of the Misses Cahal, who lived with him in Tennessee in 1876 and prior thereto, as a part of his family. In 1876 Judge Blount of San Augustine wrote Judge Caruthers advising him that the records of San Augustine county showed that T. H. Cahal owned this land, but another party was claiming it. Judge Caruthers acknowledged receipt of that letter. Judge Blount replied, advising Judge Caruthers that he was glad to furnish the information as to the land, and hoped it would be of value to the Misses Cahal, and, further, that the Kellogg headright contained 1,107 acres of land, and was about 23 miles south of the town of San Augustine, and was claimed by M. Cartwright. He also stated that Kellogg conveyed the land to Coote in 1836 and Coote to Cahal in 1838, but these instruments were not recorded until 1845, and before they were recorded the land was sold under execution to M. Cartwright. He wrote again, giving the facts as to the execution and sale to Cartwright, and again on the 11th of October, 1876, asking Judge Caruthers' opinion as to the legality of the title. Some years later he furnished Miss Dee Cahal an opinion on her title, for which he charged her $10. With this information, Judge Caruthers and the Misses Cahal declined to prosecute the Cahal claim to this land. Explaining the origin of this correspondence, Judge Blount testified:

"My name is S. W. Blount. I went to Cumberland University and studied law in 1875. That was in Lebanon, Tennessee. I knew Judge R. L. Caruthers. He was one of the professors in the law school when I was there. I also knew Miss Mary Cahal, the niece of Judge Caruthers. I had some connection with the title to this land in controversy—with the Cahal interest in it. Judge Caruthers had two nieces who lived with him, one, Miss Mary Cahal, and the other was known as Miss Dee Cahal. I suppose they were ladies between 30 and 40 years old at the time I was there. I boarded at a house right close to them and knew them both reasonably well. The first connection I ever had with this land was, my recollection is, a letter I received. I don't know which one of those ladies wrote me, but one of them did. I am inclined to think it was Miss D. Cahal that wrote me, informing me that she and her sister, as heirs of their father, Terry H. Cahal, had a claim to some land in San Augustine County, and wanted me to investigate it and write them about it.

"In a conversation with one of these young ladies (I forget which one it was), she understood I was from San Augustine County, and she said they had a claim to a piece of land in San Augustine County. That was about all there was said about it until after I had left there and come home—I don't know how long it was—it might have been six months or a year—but my recollection now is that I got a letter from one of them; I think it was from Miss Dee Cahal, asking me something about this land."

(c) Mrs. Elizabeth Guinn testified by deposition, on the 15th of May, 1926, that she was ninety-six years old; in 1838 she lived in Savannah, Hardin county, Tenn., a few hundred yards from the jail; at that time she knew a Mrs. Coote who was confined in jail on a charge of murder; she talked to Mrs. Coote; Mrs. Coote was charged with killing a man through the instigation of her husband; she did not know the name of the lawyer who represented Mrs. Coote; the Cootes left Hardin county, and she did not know what became of them; she had not mentioned the name of Mrs. Coote since she was a little girl "until a short time ago"; Mr. Griffin

asked if she remembered a woman in jail; "up to the time I talked to these two gentlemen I certainly had not mentioned the matter since I was a child. I had no occasion to do it. I reckon it was about four weeks ago since I met Mr. Griffin. They (referring to appellee's agents) asked if I knew of the case of a woman in jail. * * * He told me, mentioning the name of Coote, and I said yes. He had to ask me who it was so I would know who it was he was hunting. He asked if I remembered it and did I know anything about the circumstances and did I know Mrs. Coote was in jail." As rebutting this testimony of Mrs. Guinn, appellants offered evidence tending to show an examination of the court records of Hardin county as of the time when Mrs. Guinn said Mrs. Coote was in jail; this examination showed that no such case was docketed; there was no record of the payment of any fees to any officer in connection with any such case; further, an examination of the files of a newspaper that published news from Hardin county and its surrounding counties during this period showed no report of a criminal charge against Mrs. Coote.

(d) Mrs. Mary Cahal Osborn testified that her father, T. H. Cahal, died in 1851 at the age of thirty-five years. She also testified to the same facts on the former trial, showing the family tradition of ownership of this land; that her father got it for a lawyer fee, and the loss of his papers. For a fuller statement of her testimony on these issues reference is made to the opinions on the former appeal.

(e) The John C. Brooke who assessed this land for taxes in 1849, 1850, and 1851 as the agent of T. H. Cahal was the father of Judge Brooke who wrote the opinion of this court on the former appeal. Judge Brooke, the son, testified:

"My father was a licensed attorney at law, and was also a large planter and slaveholder.

"I do not know of my own knowledge anything about Judge Cahal, but I do know that I have heard my father very frequently speak of Judge Cahal, always speaking of him as one of his friends, and that they both lived at one time at Columbia, Tennessee.

"I did not know Judge Cahal personally. I have read many old letters after my father's death from Judge Cahal to my father. In looking over my father's papers after his death at Jasper, during the latter part of the year 1879, and all of this correspondence, with all of his papers were destroyed by me, thinking they were of no benefit to anyone. I have none of said correspondence, it having been destroyed, as above stated.

"I know from hearing my father state as much that he looked after Judge Cahal's interests in many things with reference to his property, but I cannot state with particularity the matters in which he represented Judge Cahal. I do know, as above stated, that he represented him in various matters."

(f) We take the following summary of the evidence from appellee's brief, on the reputation and character of T. H. Cahal and Austin Miller and George D. Morrow, who appear as witnesses to the Coote-Cahal deed:

"Terry H. Cahal was a man of some prominence, thus: (a) in 1834 he was a member of the Constitutional Convention representing Maury County, Tennessee; (b) He was a member of the General Assembly for the State of Tennessee in 1835 and 1836; (c) in 1844 he was Chancellor for the Middle Division of the State of Tennessee. At the close of the session of the Constitutional Convention 'Mr. Cahal moved that the session of the convention be closed by prayer'. Thus, it appears that Terry H. Cahal was a man of considerable importance, a practicing lawyer and no doubt present in Hardin County, Tennessee on February 28, 1838, at the session of court.

"Now, Austin Miller, one of the witnesses to the deed, was Judge of the Circuit Court of Tennessee and resigned that office on April 13, 1837. His letter of resignation appears in the statement of facts, page 198. He appears to have been intimate with the Hon. Newton Cannon, then Governor of Tennessee. An interesting letter in that regard appears in the record.

"George D. Morrow, the other witness to the deed, appears to have witnessed a good many instruments about that time. Thus, (a) he witnessed a deed from Irvin and Broyles to Scott, dated January 31, 1838; (b) he witnessed a deed from James Long to Daniel Long, dated July 25, 1837; (c) he witnessed a deed from Davy to Hassell, dated October 28, 1839."

(g) The Cahal heirs sold the 1,107 acres in the Kellogg headright for $1,000.

On the following argument and analysis of the facts, we sustain appellants' proposition that the instructed verdict was error. Where no suspicious circumstances attend an ancient instrument or its record, as held by this court in Niles v. Houston Oil Co., 288 S. W. 614, the court may assume its genuineness and instruct a verdict thereon, when properly received in evidence. But that rule cannot control this case. On the admitted facts, as construed by the Commission of Appeals, the Coote-Cahal deed was improperly recorded, in that William Lakey, who made the affidavit under which it was recorded, was not a witness to the instrument. Coote evidently left San Augustine county the first part of 1836, and this affidavit was made by Lakey nine years thereafter. While admissible; under the opinion of the Commission of Appeals, the record of this deed, under the attending circumstances, can have but little probative force.

As Judge Cahal was a distinguished lawyer, the fact that he did not prove up his deed for record (if in fact he was responsible for its record) by one of his subscribing witnesses, but had the same proved for record by the oath of a man who had not seen Coote for possibly nine years and was without legal authority to acknowledge the deed for record, was a potent circumstance against its validity, as was also the fact that, though the deed was executed in 1838 and recorded in 1845, the land was not assessed for taxes until 1849. The following additional circumstances, taken from the statement above, were of great weight against the validity of the deed: (a) The Cahals paid no taxes on this land, and (b) except by assessing it for taxes for the years 1849, 1850, and 1851 they made no affirmative claim thereto from the date of their deed in 1838 to the date of the Banks power of attorney in 1905, though advised in 1876 that M. Cartwright was claiming their land. (c) The heirs sold 1,107 acres of East Texas land in 1906 for $1,000. This circumstance, standing alone, would be of but little weight. Niles v. Houston Oil Company, supra. However, in view of the long nonclaim by the heirs, with knowledge of the family tradition of ownership, it was admissible as a circumstance and its weight was for the jury. (d) Appellee failed to establish, as a matter of law, that the San Augustine Coote was in Tennessee in 1838. We say this in full recognition of the testimony of Mrs. Guinn. We think the circumstances attending her testimony greatly weakened its weight. Thus, Mrs. Guinn had not thought of Mrs. Coote since her childhood until the name was suggested to her by appellee's agent, when she was ninety-six years old. She was testifying to things that happened when she was only eight years old. While she remembered that a Mrs. Coote was in jail charged with murder, the records of Hardin county, through the examination made by appellants, disclose no such case, not even disclosing the name of Mrs. Coote. However, on this issue it should be said that appellants' witness testified that some of the records of Hardin county were destroyed during the Civil War. Even a newspaper in which the news of Hardin county at that time was published did not mention the fact that a woman was in jail charged with murder committed at the instigation of her husband. Again, the San Augustine Mrs. Coote had two children. Though Mrs. Guinn said that she visited Mrs. Coote many times at the jail, and knew her well, she made no mention of the Coote children. Also there is nothing in the record explaining how appellee's agent Griffin, who made the suggestion to Mrs. Guinn that a Mrs. Coote was in jail in 1838 charged with murder, knew a fact not disclosed by the records of Hardin county. (e) The refusal of Judge Caruthers to prosecute the claim of his nieces to this land was a potent circumstance against the validity of the Coote-Cahal deed. His law student, Judge Blount, advised him of all the facts reflected by the record in San Augustine county. He and the Cahals knew of the tradition of family ownership. He was a man of great learning and renown. Certainly he owed the specific duty to his nieces, who were members of his family, to protect them in their property rights, yet he took no step to recover this land for them. Many explanations of his conduct might be suggested, but we think the issue was clearly raised as one of fact that this great and learned judge, the brother-in-law of Judge Cahal, knew that the deed was not genuine, possibly that the grantor therein was not the grantee in the Kellogg-Coote deed.

Appellee would also support the instructed verdict by article 5519a, § 1, Vernon's Ann. Tex. Civ. Statutes (Acts 1930, 41st Leg., 5th Called Session, chapter 30, p. 162), which is as follows[1]:

"Sec. 1. In all suits involving the title to land not claimed by the State, if it be shown that those holding the apparent record title thereto have not exercised dominion over such land or have not paid taxes thereon, one or more years during the period of fifty years next preceding the filing of such suit and during such period the opposing parties and those whose estate they own are shown to have openly exercised dominion over and asserted claim to same and have paid taxes annually thereon for as many as twenty years during such period, such facts shall constitute prima facie proof that the title thereto had passed to such persons so exercising dominion over, claiming and paying taxes thereon."

Under this proposition appellee says the facts bring it within the twenty-year provision, and also bring appellants within the fifty-year provision of this article. We do not determine the correctness of this construction of the facts, for, even if appellee is correct on the facts, it proved only a prima facie title, which was destroyed when all the facts came in, making the issue of title one of fact for the jury. The only effect of this article is to cast upon "those holding the apparent record title" the burden of proving that their title has not passed to "the opposing parties." That the title passes under the provisions of this article is a presumption of law and not of fact, and when evidence is offered against this presumption, as appellants have done in this case, the presumption disappears as a rule of law, and the case is in the hands of the jury, free from the conditions of this article. Janes v. Gulf Production Co. (Tex. Civ. App.) 15 S.W.(2d) 1102.

Again, appellee says that the instructed verdict should be sustained on the ground that

---

[1] As here quoted this is from the Act of 1930 cited above. It was subsequently amended by Acts 1931, 42d Leg., c. 169 (Vernon's Ann. Civ. St. art. 5519a).

appellants did not prove heirship under A. G. Kellogg. That contention is overruled. It was adjudged by the Commission of Appeals on the former appeal, at page 158 of its opinion in 252 S. W., that these appellants are "the Kellogg heirs."

If the Coote-Cahal deed was in fact genuine, we think the facts above summarized clearly established the heirship of Miss Dee Cahal and Mrs. Mary Cahal Osborn.

 Upon another trial, the court should receive in evidence, as did the court on the first trial, the following testimony, which was excluded on this trial: (a) The examined copies of certain archives in Ireland showing that a William Coote was in Ireland in 1836, 1837, and 1838. In his application made in 1835 for a grant of land in San Augustine county, William Coote stated that he was a native of Ireland and had a family consisting of his wife and two children. He disappeared from San Augustine in the first of the year 1836. On this trial it was appellee's theory that he went from San Augustine county to Hardin county, Tenn. It was appellants' theory that he returned to Ireland, and this excluded testimony was offered as evidence on that issue. On the former trial, this evidence was offered and received. (b) Appellant offered on this trial, and the court excluded, certain evidence as to forgeries committed by Epps, the county clerk of San Augustine county, who took the affidavit to the Coote-Cahal deed and recorded it. Appellee would sustain the ruling of the court excluding the evidence of forgery by the holding of this court in Niles v. Houston Oil Company, supra. We do not think the evidence offered in this case falls within the rule announced in the Niles Case, where the general reputation of forgery was against certain grantees in the deed under consideration. In this case the evidence of forgery relates to the officer whose duty it was to record this deed. The fact that the officer illegally recorded this deed, we think, makes the evidence that he was a forger of deeds admissible. As presented here, the exclusion of this testimony would not constitute reversible error because of the manner in which the exceptions were brought to this court, and we have commented upon these propositions only to aid the trial court on another trial. Discussing the testimony received by the lower court on the former trial, the Commission of Appeals said: "The trial court admitted all evidence offered by the attorneys in the case. In view of another trial, we will state that we think no serious question as to the correctness of that court's rulings in that connection can be raised, with the exception of the points we shall now discuss." The court then proceeded to discuss the testimony of Mrs. Osborn, which was received again on this trial, and against which error is assigned. No error was committed in

permitting her to testify as to the family claim to this land. The conditions imposed by the Commission of Appeals for the reception of this testimony were fully met by appellee.

 On this trial appellants proposed to read the answers of Mrs. Osborn in response to certain interrogatories wherein she stated certain facts, responsive to said interrogatories. The court refused appellants this right, unless they also read certain other portions of her testimony. Appellants complied with the ruling of the court by reading all the testimony of Mrs. Osborn on the particular issue. They now assign this ruling as error. There is no merit in the contention. By complying with the court's ruling, appellants waived their exception.

The court did not err in receiving all of Mrs. Guinn's testimony, as summarized above.

For the reasons stated, the judgment of the lower court is reversed, and this cause remanded for a new trial.

### On Rehearing.

As not being necessary to support our judgment of reversal and remand, we withdraw from our original opinion our conclusion that, though duly admissible in evidence, the Coote-Cahal deed, as recorded, "can have but little probative force."

 Because the Commission of Appeals, 252 S.W. 151, 156, clearly held that, "if it were necessary to construe the curative act of 1907 relating to defective acknowledgments, we would be inclined to hold that this copy of the deed from Coote to Cahal was admissible under that act," and because the Supreme Court approved "the holding of the Commission of Appeals on the question discussed in its opinion," in our original opinion we gave due effect to this holding by the Commission of Appeals by concluding that the record of this Coote-Cahal deed was admissible in evidence. Having so concluded, appellee insists that, in refusing to hold that the introduction of this deed made out a case sufficient to support the instructed verdict, we are in conflict with Stooksbury v. Swan, 85 Tex. 563, 22 S. W. 963, 965, and Emory v. Bailey, 111 Tex. 337, 234 S. W. 660, 662, 18 A. L. R. 901, and Niles v. Houston Oil Company, 288 S.W. 614, by this court. The proposition insisted upon by appellee can support an instructed verdict in favor of the deed in issue only, as said in Emory v. Bailey, "where nothing is disclosed upon its face as recorded, to impeach its genuineness," or, as said in Stooksbury v. Swan: "If, on proper and uncontroverted testimony, a deed be admitted as an ancient instrument [or a certified copy be duly admitted], then, in the absence of evidence, subsequently admitted, tending to show that it is not genuine, a court might, without violation of the statute, instruct a

jury to consider the execution of the instrument proved."

 Now, when this Coote-Cahal deed was before the Commission of Appeals, it made no suggestion that the record of this deed, with the attending circumstances, was sufficient, as a matter of law, to establish its genuineness, but clearly held that the issue was one of fact for the jury, and remanded this case that this issue might be properly determined. This point is given emphasis by the contrast between the discussion of the Kellogg-Coote deed and the Coote-Cahal deed. Discussing the Kellogg-Coote deed, the Commission of Appeals said: "In fact, we are very much inclined to think that there was no evidence, subsequently admitted, tending to show that the deed to Coote was not genuine and binding in every particular"; while, discussing the Coote-Cahal deed, it was said that the Supreme Court could only remand the case, "though it would be inclined to affirm the judgment of the trial court, if it had jurisdiction over all fact questions." That there is no evidence presents a question of law within the jurisdiction of the Supreme Court, and, had the genuineness of the Coote-Cahal deed been established as a matter of law, it was within the jurisdiction of the Supreme Court to say so, just as it held in regard to the Coote-Cahal deed.

On original submission, we thought the opinion of the Commission of Appeals remanding this case was an instruction to submit to the jury, as a fact issue, the genuineness of the Coote-Cahal deed. We quoted extensively from the evidence, and discussed its weight in order to determine whether the issue that was one of fact on the former trial was, by the new evidence, made a question of law on the subsequent trial. As stated in our original opinion, we thought, notwithstanding the new evidence, that this issue was still one of fact.

Appellee construes our discussion of the facts as an attempt "to throw a slur at Mrs. Guinn." The court had no such intention, either in reference to Mrs. Guinn or to any other witness in the case. We were only attempting to determine the legal effect of the testimony before us, that is, whether it raised the issues under discussion as fact issues for the jury or as law issues for the court.

 Appellee also attacks our construction of chapter 30, p. 162, of the Acts of 1930, 41st Legislature (1930), Fifth Called Session, as amended by chapter 169 of the 42d Legislature, 1931 (Vernon's Ann. Civ. St. art. 5519a). We adhere to what we say in our original opinion construing this act, but probably this act is not in the case. Discussing this act, the Court of Civil Appeals, in Easterling v. Murphey, 11 S.W.(2d) 329, 335, said: "We know of no case, and appellees cite none, where it has been held that a property right not barred at the time suit was filed is destroyed by an act of the Legislature subsequent to the filing of the suit." This act was passed long after this suit was filed and therefore, it should be said, as a statute of limitation, it should not bar rights not barred when this suit was filed.

Appellants assign error against our conclusion that the sale to Cartwright was void. We have given very careful consideration on this rehearing to the authorities on this proposition, and would say further that under Pierce Company v. Watkins, 114 Tex. 153, 263 S. W. 905, our conclusion, that the probate act discussed by us in our original opinion must control the enforcement of the judgment of the district court is sustained.

For the reasons stated, both motions for rehearing are overruled.