By BARNES, J.
The above-entitled cases are now being determined de novo by reason of separate appeals on questions of law and fact from the judgment of the Court of Common Pleas of Franklin County, Ohio.
By stipulation it is agreed that the transcript of docket and journal entries, original papers and transcript of evidence as filed in a single case may be considered as filed in each of the separate appeals without the necessity of making and filing separate transcripts, original papers, etc.
In effect, this means that the several appeals are consolidated and one opinion shall be determinative of each and all of the cases.
This is the second time this case has been in our Court.
At a former term we reviewed a judgment of the Common Pleas Court, determining the issues in favor of one of the defendants and dismissing plaintiff’s petition.
At that time we reversed the Common Pleas Court for the reason that the Court made its finding and decree without permitting plaintiff to present its evidence upon a vital issue in the case. Before the cause came up for second trial the principal defendant, Grace D. Backenstoe, had deceased, and the action was revised against her next of kin.
The second trial resulted in a finding and judgment for the plaintiff and ordered a partition of the 17 tracts of real estate specifically described in the petition. Thereafter, the requisite steps were taken through which the action was carried to our Court through separate appeals on questions of law and fact by certain defendants, all being similarly affected by the judgment of the trial court. As heretofore stated, the action was one for partition, but' when the issues were finally joined the entire controversy resolved around the question as to whether or not Maurice Patrick Murnan and Grace D. Murnan, referred to in the petition as Grace D. Backenstoe, were married at the time of Pat Murnan’s death.
As against the defendant,- Grace D. Backenstoe. plaintiff in his petition alleged that Grace D. Backenstoe, who claims some interest in the premises described in the petition, had been in possession *137 thereof since the death of Pat Murnan, May 12, 1937, and during such time had collected the rents and profits therefrom without accounting, and will continue so to do unless otherwise ordered by the Court. In the prayer of the petition it was asked that Grace D. Baekenstoe be required to set up what, if any, interest she claimed in the premises, and that the same be declared Void; that she be required to account for the rents and profits received by her; that a trustee be appointed and for other relief.
As against all other defendants the prayer was for partition.
Plaintiff’s petition was filed February 28, 1938, and on March 31, 1938, Grace D. Baekenstoe filed answer. The answer in substance averred that many years ago she was Grace D. Baekenstoe, and under that name is made one of the defendants in the cause.
“Further answering, this defendant says that she is the surviving spouse of one Maurice Patrick Murnan who died intestate on May 12, 1937, owning certain real estate; that said Maurice Patrick Murnan, deceased, leaving no parent surviving him and leaving only this answering defendant, Grace Murnan, as his surviving spouse, that as such this defendant is the only heir at law and next of kin, and by virtue of that relationship this answering defendant inherits from Maurice Patrick Murnan all of the real estate of which he died iseized.”
In the prayer it was asked that plaintiff’s petition be dismissed, etc.
Prior to the first trial in the .Common Pleas Court counsel for plaintiff and some of the claimed defendant heirs duly took the deposition of Grace D. Baekenstoe at her then residence known as Graceland, and located on North High Street, Worthington. At the time this deposition was taken Grace Murnan was sick in bed with what proved to be her last sickness. Her counsel presented to the Court a medical certificate from her attending physician to the effect that she was not physically able to attend the court hearing. However, no postponement of the hearing was requested on this account.
Following her death and the revivor of the action, several of the new defendants, claiming to be heirs of Grace Murnan, filed answers. These several answers restated the substance of the answer of Grace Murnan and in addition they contained a general denial of plaintiff’s petition. It will be noted that the answer of Grace Murnan did not contain a general denial of plaintiff’s petition. We mention this at this time since it is urged that the state of the pleadings controls the question of burden of proof. This question will be discussed more fully later in the opinion..
On February 24, 1939, Mary Meyer, a claimed direct descendant of Maurice Pat Murnan, filed an answer and cross-petition which, in addition to the requested partition of the 17 different tracts of real estate described in the petition, also described and asked partition of the North High Street 71-acre farm, known as Graceland.
The cross-petition also asked for the appointment of a receiver, setting out that since the death of Grace Baekenstoe her executor had been collecting the rents and profits from all the real estate referred to in the petition and cross-petition. At the time of the filing of the cross-petition by Mrs. Meyer the recorded title to Graceland was in the name of Grace Daugherty Murnan, the deed therefor being from Maurice Pat Murnan to Grace *138 Murnan, his wife, dated March 17, 1922, but not recorded until after the death of Pat Murnan. It was the claim of the cross-petitioner that it had not been delivered prior to the date of death of Pat Murnan.
The latter had acquired the property in 1919 by purchase.
While we are on the subject of the show place known as Graceland, we might say that the evidence relative to the execution and delivery of the deed from Murnan to his wife, Grace Daugherty Murnan, is amply supported, and therefore we need give no further consideration to this particular tract of land sought to be brought in for partition under the cross-petition.
However, following the filing of the cross-petition the trial court appointed a receiver for the seventeen tracts in the person of H. W. Kilbourne, who at the time was also acting as the executor of the Grace Daugherty Murnan estate.
With this brief history of the issues joined under the pleadings we now come to a consideration of these factual issues with the attending procedural questions. By stipulation of counsel it was agreed that a transcript of the testimony taken before the trial court, supplemented by such additional testimony as either side might desire to present, either as depositions or in the form of depositions, including identified exhibits, should constitute the evidence in our Court. For convenience it was again agreed that this evidence would be divided into four volumes: Volume I, consisting of 292 pages, was the evidence presented to the trial court; Volume II, containing 172 pages, plus exhibits, and containing testimony of 14 persons on behalf of appellants; Volume III, consisted of additional testimony of appellants taken by depositions at different times and described as Detroit, Michigan, depositions and Cleveland depositions; Volume IV contained identified exhibits of former volumes and two depositions, one by plaintiff and the other by defendant, taken at Flagstaff, Arizona, being the testimony of Miss Mary P. Lewis, present Clerk of Courts of Flagstaff, Arizona, and also the extended testimony of some other witnesses.
It at once becomes apparent that' the reading of this mass of testimony is a laborious task. However, we have waded through it and read every word of it. The briefs of counsel are very helpful in that they have brought to our attention the pertinent Court decisions not only in our state, but also in sister states, and in addition have at length copied excerpts from the testimony of practically all the witnesses. Several briefs also contain indexes, but we are sorry that we are unable to compliment this effort. If there is anything we dislike it is making up an index in alphabetical order. What we desire is topical headings and thereunder references in chronological order. If counsel are interested in what the Court thinks is the most helpful form of brief we would refere them to Bule VII of our Court.
Before we take up an analysis of the evidence it is proper to determine the controverted question of “burden of proof”.
It is the claim of plaintiff, since there is no dispute that the petition correctly lists the blood relatives of Pat Murnan and the degree of kinship, that the claim of Grace Murnan and her privies that she was the widow of Pat Murnan, constitutes an affirmative defense and therefore the burden would be upon her to establish that she was his widow. On the other hand, it *139 is the claim of defendant in this Court (although not very seriously contended in the lower court), that merely establishing relationship does not establish heirship, and that since the petition alleged that Mrs. Murnan was in possession of the premises sought to be partitioned, the plaintiff and his co-relatives would only become heirs after other classes, including the widow, would be eliminated.
We think .a rule of reason, as well as the authorities, support the conclusion that in the instant case the burden of proof is upon the plaintiff.
Generally the burden of proof is upon the plaintiff or at least it is on the person who holds the affirmative in ' any controverted question. When the burden of proof is established under this rule, it never changes, although there may from time to time be a change as to the obligation of going forward. This frequently happens where the strict observance of a rule of proof might require a party to prove a negative, but even when these situations arise the burden of proof is not changed. We are unable to agree with counsel for the plaintiff that the answer of Grace Murnan, by reason of not containing a general denial, was in effect an admission of the allegations of plaintiff’s petition. The effect of her answer was to challenge the allegations of the petition that the plaintiff and the groups referred to in his petition Were the heirs of Pat Murnan. If ■Grace Murnan was the widow, the plaintiff and defendant groups similarly related could not be heirs. The classification into which plaintiff seeks to bring himself and certain of the defendant groups is subdivision 6 of §10503-4 GC, which xeads as follows:
“6. If there be no spouse, no children or their lineal descendants, and no parent surviving, to the brothers and sisters, whether of the whole or of the half blood of the intestate, or their lineal descendants, per stirpes.”
Before relatives can be considered heirs, all the persons mentioned under subdivisions 1, 2, 3, 4 and 5 must be eliminated. The first five words under subdivision 6 read “If there be no spouse”. The mere allegation of the petition, either directly or indirectly, that there was no spouse can not establish this material fact when a named defendant comes in and files answer averring that she is a surviving spouse. Added reason for the rule in the instant case is the fact that the petition alleges that this defendant was in possession since the death of Pat Murnan and collected the rents and profits.
Sincerity of belief on the part of plaintiff and kindred defendant groups that the defendant. Grace was not the spouse would not alter the rule of proof.
The further fact that under some situations this rule would place upon a claimed heir the burden of proving a negative and require making inquiry in every county and city in the United States and all foreign countries is not persuasive. Even so, we can not determine that the difficulty in procuring evidence changes the burden of proof. In practical effect we doubt if any situation would ever arise as is apprehended under the above situation.
We have been referred to the following authorities which we think amply support our conclusions:
Sorensen v Sorensen, 68 Neb. 483, (94 N. W. 540).
In re Evans Estate, 291 N. W. 460, (Iowa, 1940).
*140 Wehrman v Savings Bank, 259 N. W. 504, (Iowa, 1935).
Boulder v McIntyre, 119 Ind. 574, (21 N. E. 445, 1889).
Schuhart v Schuhart, 61 Kas. 597, (50 L. R. A. 180, 1900).
Gibson, Admr., v Commonwealth, 257 Ky. 487, (78 S. W. (2d) 336).
Hopkins v Hopkins, 287 Mass., 542, (192 N. E. 145).
Voliotes v Ventorria, 86 N. H. 52, (161 Atl. 921).
Kellogg v Lumber Co., 44 S. W. (2d), 742.
Bishop on Marriage and Divorce, 6th Ed. Sec. 457.
18 C. J., Descent and Distribution, Sec. 124, 126, 129.
' 18 R. C. L., p. 428.
Emerson v White, 29 N. H., 482.
Mitchell v Thorne, 134 N. Y. 536, (32 N. E. 10).
Savery v Taylor, 102 Mass., 509.
Thompson on Real Property, Vol. V, Sec. 2445, p. 199.
Proctor v Lowe, 105 N. J. 506, (148 Atl. 787, 1930).
We will not add to the length of this opinion by making quotations from the above cited authorities, but do say very emphatically that the cases unequivocally support our conclusion that the burden of proof in the instant case is upon the plaintiff.
Plaintiff-appellee and other claimed heirs similarly situated, through their counsel, urge very strenuously and convincingly that Maurice Patrick Murnan and Grace Daugherty Backenstoe were never married. This claim is based on two distinct reasons: first, that
Grace Daugherty, many years ago, was married to one Backenstoe, and that no legal divorce having-been obtained, she is still the wife of Backenstoe and therefore, under the law, would be unable to legally contract a marriage with Pat Murnan.
As a second claim it is urged that the evidence conclusively establishes that no marriage contract, either ceremonially or at common law ever existed between Maurice Pat Murnan and Grace Daugherty Backenstoe.
We take these questions up in. the above order.
The evidence conclusively establishes that Grace, who was born Daugherty, many years before her acquaintance with Maurice Pat Murnan, was married to GeorgeBackenstoe. In the year 1912, she brought an action in the insolvency court of Cuyahoga County for a divorce against her then husband, George Backenstoe. Personal service was not obtained and an affidavit was filed in the usual form for service by publication. This affidavit, duly signed by Grace Backenstoe, was sworn to before a notary public who was her acting attorney in the divorce action.
In December of 1912, the cause came on to be heard and a divorce was granted to Grace Backenstoe. It is now urged that the insolvency court of Cuyahoga County had no jurisdiction to entertain the action for divorce for the reason that no legal affidavit had been filed as a condition precedent for service by publication. It must be conceded that Grace Backenstoe’s attorney did not have the authority under the then existing law to act as a notary public in swearing her to the affidavit as a predicate for service by publication. See the following sections: 11524 GC, 11527 GC, 11532 GC.
Counsel for appellee in support of their claim that the divorce could not legally be granted, cite the following authorities:
State v Jackson, 36 Oh St, 281.
Beck v Beck, 45 Oh Ap, 507.
North Star Lbr. Co. v Johnson, 196 Fed. 56.
Kingsborough v Tonsley, et al., 56 Oh St 450.
*141 The ease of Beck v Beck, supra, is very similar except in that case it was a direct attack and therein the Court held that the Court was without jurisdiction of nonresident defendant in divorce action. On page 510 of the opinion, near the bottom of the page the Court calls attention: “This being a direct attack upon the judgment complained of”, etc.
The first case cited was a criminal action charging perjury. The pertinent question was as ' to whether or not the officer purporting to administer the affidavit had the authority so to do. Determining that no such authority existed, there could not be perjury. (Other cases cited indicate that they involved direct attacks.)
We are referred to the case of Hudson, Admr., v Owens, Vol. 28, O. L. R. 221, decided December 17, 1928. This was a decision by the Court of Appeals of the 8th District, opinion by Vickery, J. The factual situations are identical with the instant case. The affidavit for service by publication was verified by the attorney acting as a notary public. The syllabus presents an understandable history with the legal announcement:
“A resident of Cleveland, nine years before his death, on notice by publication, procured a divorce from his wife with whom he had formerly lived in Georgia. Subsequently, the wife appeared in Cleveland, and brought an action for alimony without asking that the decree of divorce be disturbed, and the court awarded her $1000.00 which was paid. Following the death of the husband, an administrator was appointed for his estate, which the former widow caused to be set aside and letters issued to herself on the ground that she was the widow of the decedent.”
“Held: the conclusiveness of the decree of divorce was in no way questioned by the action of the Common Pleas Court in entertaining the wife’s action for alimony, and could be challenged or reversed only by direct action, brought within the prescribed time, asking that the divorce decree be set aside; and the former wife is now estopped from claiming the right to administer the estate of the decedent as his widow.”
Counsel for appellee argue that the legal pronouncement in the Hudson case, supra, was not applicable to the instant case for the reason that the reported case was a review from a decision of the Common Pleas Court, whereas in the instant case the attempted decree was by the insolvency court.
We are unable to see that this distinguishes the two cases. The claim that the insolvency court is a court of limited jurisdiction can make no difference, for the reason that it had been granted equivalent jurisdiction to that of the Common Pleas Court. It is quite correct to state that all courts are more or less of limited jurisdiction. The Legislature has the unqualified authority to prescribe the jurisdiction of any and all trial courts. The mere fact that the insolvency court did not have the jurisdiction to enter into all fields to which the right was given the Common Pleas Court could make no difference. The fact that they were given jurisdiction equal to and like the Common Pleas Court in divorce and alimony matters would be all that was required.
The decision of the Supreme Court in the case of Adams, Judge, v State, ex rel., 104 Oh St, 475, is enlightening and in point.
*142 It is our conclusion that the evidence in the instant case sustains the claim of a legal divorce having been granted to Grace Murnan in 1912, at least as against a collateral attack.
This brings us to a consideration and determination of the vital issue in the case.
Was Grace Backenstoe Murnan married to Maurice Pat Murnan at the time of the latter’s death in 1937? These two people'for many years were well known underworld characters in the City of Columbus. Pat was' a big gambler and Grace, the madam of a well-established sporting house.
Both engaged in a disorderly business, yet each sought to conduct Their business m an orderly manner. Neither was ever arrested. While both were continuous law violators, they both were considered unusually honest, particularly among people who considered their respective businesses as necessary evils. Pat Murnan was previously married, his wife having-died in about 1912. Grace had previously been married to George Backenstoe and she was granted her divorce in November, 1912. During the latter part of the year 1914 or the early part of the year 1915, Pat was paying more than usual attention to Grace. In June of 1915 Pat took Grace on a trip to the Pacific coast and the California Exposition. The trip was made by automobile. The acting-chauffeur and mechanic was Homer Byers. Tommy Stewart, a former employee of Murnan’s, also accompanied the party on the trip. During the stay in California Grace was sick and unable to attend the Exposition, except for one-half day. During the latter part of July the party started back.
When they reached Barstow, California, Pat and Grace, on account of the latter’s sickness, took the train to Flagstaff, Arizona, arranging that the chauffeur and his helper would drive the car through the Great American Desert. This arrangement placed Pat and Grace in Flagstaff a day or so ahead of the chauffeur. According to the testimony of Grace given in her deposition taken during the year 1939, it was during this day or two’s stop in Flagstaff that she and Pat were married. The marriage took place before a justice of the peace. Pat made all the arrangements.
Following the deposition evidence of Grace, giving Flagstaff, Arizona, as the place of marriage, and July, 1915, as the time, counsel representing both sides of this controversy investigated the marriage license records in the proper office in Flagstaff, Arizona, and through deposition evidence subsequently taken developed the fact that the records do not disclose any marriage license having been issued to Pat Murnan or Grace Daugherty. Starting from this point both sides have exhausted their efforts in seeking supporting evidence to sustain their respective contentions. The Arizona statutes in effect in 1915 were introduced in evidence. One of the specific provisions of the Arizona statute is not to recognize common law marriages in that state. The pertinent sections provide for the issuing of licenses and designate the individuals who can perform marriage ceremonies.
It is also a requirement that the individual performing the ceremony shall have the contracting parties sign at the proper place and he shall certify the fact of their marriage and return the certificate to the Clerk’s office where it shall be recorded in a permanent record.
*143 While the different sections of the Arizona Code provide much detail in the interest of having and preserving records, yet, as we view it, the only thing essential to constitute a ceremonial marriage was the issuing of a license to the contracting parties and the performing of the cermony by a designated person under the statr,ute. While the performance of all ithe ministerial duties would be important to all couples marrying in the state, yet the failure to perform mere ministerial duties would not void a ceremonial marriage if, in fact, it was duly performed. This principle of law is directly announced by Section 1217 of the statutes of Arizona. To same effect, see Section 3844 of the Revised Code of Arizona.
Of course the presumption is very strong that the proper officer of the state of Arizona took care of his records in a proper manner, and the fact that the bound volume contains no record of a license having been issued to Pat Murnan and Grace Daugherty argue very strongly that no such license was ever issued. Considering the very 'full and complete testimony of Miss Mary P. Lewis, Clerk of Courts of Flagstaff, Arizona, as presented in her deposition, we necessarily arrive at either one or the other of the following conclusions:
First, no marriage license was ever, issued to Pat Murnan and Grace' Daugherty; or, second, the County Clerk failed to make a record of the issuance of such a license. This failure might be wilful or accidental. For instance, if Pat Murnan went into the Clerk’s office and procured a license to marry,- such a license could be issued by the Clerk without at the same time making a record of the fact of such issuance.
After the justice of the peace performed the marriage ceremony he could deliver the marriage papers to the contracting parties, although there was a statutory requirement that he make a return to the Clerk’s office. The County Clerk testifies that it sometimes happens that the person performing the marriage ceremony does deliver the marriage license containing the certificate of the marriage ceremony to the contracting parties to be by them delivered to the County Clerk. If the contracting parties, entrusted with the delivery of the certificate of marriage to the County Clerk, fail so to do, this would not void the marriage, but would merely negative the desired record.
The chauffeur, Homer Byers, testifies that when he arrived at Flagstaff with the big open Packard car and drove it into the garage, that he received some information from the garage man that caused him to go to the Court House and into the Clerk’s office; that he inquired about a marriage license between Pat Murnan and Grace Backenstoe, and that the Clerk threw out a document and then and there he saw and read the marriage license contract between Pat Murnan and Grace Daugherty. The difficulty with this witness’ testimony is that he saw too much. Many of the things which he says he saw and read on the document are not contained in Arizona marriage licenses.
It sometimes happens that the Clerk before issuing a license requires the applicant securing the license to sign an affidavit. According to the testimony of the County Clerk the affidavits are most frequently required where there is some doubt as to the age of one or both of the contracting parties, although sometimes they *144 are required in other instances. These affidavits are not required to be recorded, nor are they required to be preserved. The present County Clerk was able to find in her office for the year 1915 an average of one affidavit to every six licenses. This ' affidavit form would more nearly conform to what Chauffeur Byers says he saw and read in the County Clerk’s office, but there would still be a substantial variance. One of the incidents in his 'testimony is the fact that he states that the contract of marriage was between Pat Murnan and Grace Daugherty. We think from other parts of his testimony he had always known her as Grace Backenstoe.
An effort was made to impeach the testimony of the witness by showing that many years previous when the trial court was prosecuting attorney, the witness testified falsely in a certain criminal action. The form of this inquiry indicates that counsel was propounding the impeaching questions from a transcript record, possibly a bill of exceptions. The witness did not admit that he had made the allegedly false statements, but said that he could not remember what his testimony was in that particular case. The groundwork was clearly laid to present the impeaching testimony, but for some reason this was not done. It was the view of the trial court that this witness was not worthy of belief. If we were reviewing as an error proceeding, we would accept this view of the trial court without question, but since we are determining the matter de novo, we can not overlook the omission of the impeaching testimony.
After the party left Flagstaff there is evidence of an incident that happened at Colorado Springs. Murnan and his party had stopped in front of the Antlers Hotel. Mr. Charles Schaefer, a merchant tail- or of 52 East Broad Street, Columbus, Ohio, had been to the California Exposition with about 150 members of the local Shrine. He stopped at Colorado Springs on his return and gives the date as July 27th. Mr. Schaefer saw and recognized Mr. Murnan, stepped out to the car and spoke to him. Mr. Murnan immediately introduced him to Mrs. Murnan. “He says ‘Charley, we are married;’ and I said, ‘Is that right?’ He said, ‘Yes, we were married in Arizona, and are on our wedding trip.’ ”
The next episode brings us to Columbus. Grace returns to her house at 140 Front Street and Pat goes to his mother’s. The evidence is uncontradicted that upon the return to Columbus no public announcement was made of the claimed marriage. Quite a few witnesses are called who testified that both Grace and Pat at different times confided in them as to their marriage, but generally asked them not to say anything about it. The reason for keeping it secret was generally understood to be on account of their respective businesses. At this time Pat was in the taxicab business. According to the witnesses it was the view of Pat and Grace that a public announcement would be injurious to the taxicab business.
One of the incidents of letting the marriage be known to friends was a happening in the fall or winter of 1915 when Pat and Grace made one of their frequent trips to Mt. Clemens, Michigan. At that time there was living in Detroit a Mr. and Mrs. Carey, both of whom had formerly lived in Columbus. On the way to Mt. Clemens the Murnans stopped at the Carey home and invited them to a fish dinner on the following evening at *145 Mt. Clemens. They accepted the invitation and Pat’s chauffeur came in for them, a distance of about 27 miles. Just as they were seated at the table Pat told them this was their wedding dinner for them, further stating that they had been married on their trip during the summer. Carey said that Pat told him about the officer that performed the ceremony, but that he could not recall the peculiar name that he gave to him, but he said that he gave him a tip of $20.00 when he was only supposed to pay 50 cents or a dollar.
Another incident of moment is presented through the testimony of Louis Nodario. He now lives and runs a bowling alley in Cleveland, but in years past was frequently in Columbus. As a youngster he was a page in the Ohio Senate and later indicates he was a right-hand man of Theodore E. Burton during his candidacy for the United States Senate. Later the witness was connected with the State Highway Patrol and worked out of the office of Governor Bricker. His first acquaintance with Pat Murnan was when he was making the arrangements for taxi service for Senator Burton. During the time he was living in Columbus he also became acquainted with Grace Backenstoe. He would go to her place very frequently and drink with her. He relates an occasion in December, 1915, when he was in this house of Backenstoe’s on Front Street with another girl, and the three of them were in the recreation room, drinking; that Pat walked in and joined them. The witness at this time says that he said to Pat, “What is this that I hear about you two being marrined?” Grace then spoke up and said, “We can trust Louie”, and the four of them then proceeded upstairs to Grace’s very beautiful bedroom; that she went to a safe or a panel in the wall and got out a paper and showed it to him, and he said it was the marriage license of Maurice Pat Murnan to Grace Daugherty. He says that he asked about the name “Daugherty”, as he had always understood the name to be “Backenstoe”, but she told him that she had been restored to her maiden name of “Daugherty”. The witness says that Pat and Grace told him that they were married while they were away; further, that on this occasion Pat asked him to get in touch with the diamond merchant from whom Grace had been buying her diamonds, which he did, and it resulted in Pat buying for her a seven-carat diamond, and at the same time or a little later, a very beautiful and large diamond lavalier.
The testimony of this last witness was only discovered after the case was appealed to our Court. He was not a witness in the trial court. This testimony is strongly supporting.
A longtime employee as chauffeur, both before and after 1915, testified that during that year when he was working in Pennsylvania he received a post card from Pat and Grace announcing their marriage on their western trip.
Anna B. Beyerly was also' called as a witness. She had lived a very active life and at the time of taking her testimony was a woman in advanced years. Prior to 1915 she owned a farm north of the city and approximately two miles from the farms subsequently purchased by Pat Murnan. Some two or three years prior to 1915 Pat Murnan arranged with Mrs. Beyerly to take care of two registered calves. After this arrangement was made he would frequently drive out to see them. Some time after *146 the middle of 1915 he drove out and had Grace in the car. Mrs. Beyerly testifies that he called her over to the car and introduced Grace as his wife. This acquaintance was continuous after the Murnans moved out to Graceland up until the time of the death of Pat Murnan.
Margaret Lunn was also called as a witness on behalf of the defendant. Mrs. Lunn was a niece of Pat Murnan. She testified that shortly after the birth of her daughter on August 31, 1919, she visited her grandmother, Mrs. Margaret Galvin, on an occasion when Pat was at the home. Mrs. Galvin was Pat’s mother. She further testifies that this was about the time the Murnans had moved to the farm. She further testifies that on this occasion Mrs. Galvin asked Pat if he was married and he answered, “Yes, Mother, I am”. “And he made a motion to get papers out of his pocket. Grandma says, ‘It isn’t necessary to show me any papers. If you say you are married, Maurice, that is all that is necessary, because you never told me a lie in your life.’ ”
Counsel for defendant also called as a witness a man who had been in the saloon business and he testifies that in 1915 Pat told him that he and Grace had been married on their trip out west and at that time treated all patrons then in the saloon.
There are several other persons to whom either Pat or Grace or both, confided that they had been married in Arizona on this western trip.
Aside from the more or less intimate friends or associates, the ■public generally were not informed as to the claimed marriage between Pat and Grace.
They continued to act as single persons. Grace’s sporting house was continued under the name of Grace Backenstoe. Deeds or other documents were signed and executed as single persons. Their bank deposits and signature cards were just the same as before. Within a year or two after this claimed marriage, Pat negotiated a trade of two pieces of real estate. He executed the deed as a single man, conveying his property to his grantee and the second party to the trade executed the deed to Grace Daugherty, which became the residence of Grace’s mother, and remained so until the latter’s death.
In 1917, after we became involved in the World War the Government issued an order prohibiting the operation of houses of ill fame within five miles of a military cantonment. This caused Grace, as well as all others in like business, to close their business and this occurred in August, 1917. Thereafter, for a period of time she continued to operate the place as a legitimate rooming house, but sometime later, the exact time not being known, the business was closed up in its entirety. Sometime in 1919, a marked change arose in the lives of these two people. This was the time they moved to the 71-acre farm known as Graceland. Throughout the record it is spoken of as a show place, and as being located in an aristocratic district.
Prom this time on all deeds and other documents executed by either were executed as a married person, with release of dower by the other. There are some ten or eleven instances where deeds were executed. One of the first deeds was that for Graceland and purported to be a deed from Pat Murnan to Mrs. Grace Murnan, his wife. Prom this time on there was presented a procession of witnesses from all walks of life, supporting the claim that Pat Murnan spoke of and introduced Grace as Mrs. Murnan.
*147 There was also evidence presented that Grace sold her property on Front Street to the Lazarus Company for a consideration of something more than $50,000.00, and shortly thereafter and during the same year took out a building permit to build a $50,000.00 structure on one of Pat’s lots. As we understand, this is one of the properties sought to be partitioned at this time. Evidence is introduced that Pat spoke of this business building as belonging to Grace, although it now develops that the title was in Pat.
This record presents much additional evidence supporting the respective claims of the litigants, but it would merely be cumulative in character and we do not deem it advisable to further review the evidence.
We find little, if any, controversy as to the applicable law. There is a marked difference as to its application.
We start with the well-recognized principle that the lex loci is controlling on marriage contracts as well as all others. Under the laws of Arizona common law marriages are not recognized. Under the law of Ohio common law marriages are recognized. Under the situation in the instant case it is our judgment that the marriage of Pat and Grace must be based on the proof of a ceremonial marriage or none at all.
It would not always follow that claim of ceremonial marriage would defeat proof of common law marriage. For instance, where one of the contracting parties honestly believed that a ceremonial marriage had been performed, and later discovered that there was some defect which went to the substance, then and in that instance a theory of common law marriage might obtain.
One of the latest cases decided by our Supreme Court is entitled In re Estate of Redman, 135 Oh St 554. This decision is a per curiam. This case makes the pronouncement that to constitute a common law marriage the essential elements must be shown by clear and convincing evidence and an agreement in praesenti is necessary.
A first reading this case might indicate that the rule of law requiring common law marriages to be supported by evidence of agreements in praesenti was being emphasized. A careful study will disclose that the peculiar fact being considered was responsible for the Court’s pronouncement. In this reported case the claimed husband, who was seeking curtesy in his wife’s property had presented evidence that the two had lived together as man and wife and had been introduced to their friends as such. However, the „ husband testified in answer to a question put to him in cross-examination as to whether or not he and his paramour had ever talked about marriage, said that they had talked about it, but “not for them”. This testimony at once refuted any claim of marriage and occasioned the Court’s pronouncement of the rule requiring agreements in praesenti.
This in no sense was a new rule. The Supreme Court had made the identical pronouncement in the case of Umbenhower v Labus, 85 Oh St 238. On page 248 of the opinion Judge Price quotes from the case of Bruner v Briggs, 39 Oh St 418:
“A marriage in fact may be established by showing that they lived together and cohabited as husband and wife for a series of years, that they always recognized and treated each other as such, *148 and that they were so treated and reputed in the community and circle in which they moved, although no record evidence was offered, nor the evidence of any witness who saw them married was given. Such is competent and its sufficiency to establish the fact of marriage is for the court or jury trying the issue to determine.”
The above in effect refers to a rule of proof.
To the same effect we quote from O. Jur., Vol. 26, (Marriage) p. 87, §80:
“A ceremonial marriage may be proved by admissions of the parties, if no record is made, or if records are made, but are subsequently lost or destroyed. Such declarations and admissions of the husband and wife are generally admissible, not as hearsay evidence, but as original evidence of facts from which the marriage may be inferred. Such admissions may often establish a prima facie case, and are always admissible in evidence as tending to prove the fact of a disputed marriage, and they have been held, in some civil cases, to establish an estoppel, where undenied.”
Also, see Section 81:
“It is a general rule that marriage may be shown by habit or repute, and in Ohio, that a marriage may be proved by reputation, as, for example, by a reputation of living together as husband and wife; evidence of cohabitation as husband and wife, and of mutual recognition of that relation by the parties, is competent as tending to prove the marriage. Thus, when the right to succession of an estate depends upon the existence of a marriage, such marriage may be proved by the reputation of the parties.”
“A ceremonial marriage may be proved by cohabitation, when no record is made, or, if made, when it is lost or destroyed. A common law -marriage may be established by direct evidence of the contract or, as is usually done, by proof of cohabitation, and reputation thereof, sufficient to establish the marriage. Evidence of cohabitation, and reputation thereof, is admissible in favor of the wife, or her child, in order to prove a common law marriage, even though the wife testifies to the making, and the terms, of the contract, in verba de praesenti. In both civil and criminal cases, evidence that the parties have lived together as husband and wife is always admissible. The authorities are numerous to the effect that in a civil action, a marriage may be shown by reputation and continued cohabitation.”
The Legislature of Ohio has by enactment prescribed a rule of evidence on the question of marriage.
“Section 11989 GC. Evidence of Marriage. Proof of cohabitation, and reputation of the marriage of the parties, is competent evidence to prove such marriage, and within the discretion of the court, may be sufficient therefor.”
We take the following from Ruling Case Law, Vol. 18, “Marriage”, §62:
“Cohabitation and repute do not constitute a marriage, but are only evidence tending to raise a presumption of marriage, of more or less strength according to the circumstances of the case, and *149 Which increases with the lapse of time the parties are cohabiting as husband and wife. The presumption of marriage, from a cohabitation apparently matrimonial, is ■one of the strongest presumptions iknown to the law, but it is not ■conclusive and may be overcome by competent evidence.”
“An attempted ceremonial marriage in good faith entered into by ■pne of the contracting parties, even ■though irregular or void will, ¿through the actual agreement to ‘be married and continuous cohabitation establish a valid marriage at common law.”
This is the pronouncement of ■our Supreme Court in the case of Johnson v Wolford, et al., 117 Oh St 136.
In the light of the evidence in the instant case construed in conmeetion with the existing law, how stands the case at bar? The long-continued cohabitation as man and wife and generally so recognized in the community and even by at least one of Pat’s nieces who addressed Mrs. Murnan as Aunt Grace, strongly supports the claim that Pat and Grace were husband and wife. The statement made to numerous friends that they were married in 1915 in Flagstaff, Arizona, presents the claim of a ceremonial marriage. The evidence is very strong that Grace, at least, thought the marriage in Flagstaff was regular in every particular. ■She testifies that Pat attended to all the details. This means that he procured the license, secured the magistrate and took care of the papers. If there was any irregularity Pat might be in position to have knowledge thereof and Grace would not. We do not mean to say •that there were any irregularities, but are merely canvassing the possibilities. Mere irregularities, even though they might deny a ceremonial marriage, would not refute a common law marriage under the decision of our Supreme Court in the case of Johnson v Wolford, 117 Oh St 136.
Does the fact that the marriage records in the Superior Court of Flagstaff, Arizona, fail to show that any marriage license was ever-issued to Pat Murnan or Grace Daugherty overcome the claim of marriage as advanced by the defendants? This evidence, coupled with the fact that no marriage certificate was introduced in evidence presents a very strong denial of marriage, but it is not conclusive. In addition to the numerous statements made by Pat and Grace to close friends that they were married in Flagstaff, Arizona, we have the evidence of two witnesses who say they saw the marriage contract. It is true the evidence of the chauffeur who testifies that he saw the papers in the clerk’s office in Flagstaff, is of doubtful veracity. In his desire to help, his testimony as to what he saw and read is not supported by the evidence of what such documents would contain. We are not prepared to say that this witness did not go to the clerk’s office, nor would we want to say that he did not see something, but even if this testimony be ignored in its entirety we still have the testimony of another witness who says that in December of 1915, he saw and read the marriage license between Maurice Pat Murnan and Grace Daugherty. Could it be possible under the plan of operation in the office of the Clerk of Courts at Flagstaff, Arizona, that a marriage license was issued, but never was recorded? The marriage license blanks were in identical form as *150 the marriage record. These blanks ■were not taken from the record and could be very readily made out and delivered to the contracting party with the idea of recording when the return was made by the person solemnizing the marriage. Apparently, it was the practice to make the return on the same blank. It is in evidence that sometimes the person performing' the marriage ceremony did not make the return himself, but entrusted the document to one or the other of the marrying parties to make the return by him or her. If the marriage contract containing the marriage certificate was not in fact returned to the Clerk’s office this might be a solution as to why the same never got into the record. It is also necessary to meet the evidence that the cash book in the Clerk’s office fails to show any entry of the payment of the usual fee upon the issuing of a marriage license. This is difficult to overcome, but may be the result of carelessness or even by design. The individual who was Clerk of the Courts in 1915 is not now in office and his present residence is unknown. The Flagstaff magistrate who was in office in 1915 is now deceased.
Through the deposition of the present County Clerk in Flagstaff there was given a very full and detailed description of the marriage records from 1912 to 1920. The volume is substantially bound and paged from 1 to 590. Each page contains the blank marriage license and blank marriage certificate. These pages are securely bound and are not loose-leaf. It was disclosed from the evidence that another license issued in June, 1915, did not get into the record until the early months of 1916. This disclosed that the system was not foolproof. If in the instance where the license was issued in June, 1915, it did not get into the records until 1916, it may be an explanation why in the instant case there is no record at all.
We are constrained to the view that plaintiff has failed to establish by a preponderance of the evidence, that he and defendant group similarly related are surviving heirs of Maurice Pat Murnan.
We make the factual determination that Maurice Pat Murnan and Grace Daugherty were husband and wife at the date of the death of Maurice Pat Murnan, and by reason thereof Grace Daugherty Murnan was the sole surviving heir.
Plaintiff’s petition will be dismissed and costs adjudged against plaintiff-appellee.
Cause remanded to the Common Pleas Court for further proceedings according to law.
GEIGER, PJ., concurs.
HORNBECK, J„ dissents.